## SUPERIOR OIL CO. *v.* BEERY.

Feb. 23, 1953

No. 38528 21 Adv. S. 62 63 So. 2d 115

Apr. 27, 1953 29 Adv. S. 34 64 So. 2d 357

June 8, 1953 34 Adv. S. 180 65 So. 2d 455

*Wells, Thomas, Wells & Smith, W. B. Wagner* and *Murray Christian,* for appellant.

*Livington & Livingston* and *Hall & Callender*, for appellee.

672

*Green, Green & Cheney,* amici curiae.

McGEHEE, C. J.

This is a suit in equity wherein the complainant, Roy Beery, obtained a decree for the cancellation of an oil,

gas and mineral lease held by the defendant, Superior Oil Company, as a cloud upon his title to a 15/50th mineral interest in a 50-acre tract of land included in the 320-acre gas drilling Unit No. 39 of the Gwinville Gas Field in Jefferson Davis and Simpson Counties. The principal basis of the suit is that the ten-year primary term of the lease thereon had expired by its terms on December 29, 1949, and it is contended that there had been no production from said 50-acre tract of land thereunder. The decree also awarded unto the complainant the sum of $6,120.87, which represents 8/8ths instead of 1/8th of 15/320ths of the market value of the gas produced from Superior's Dale Well No. 1 on adjacent land in said Gas Drilling Unit No. 39, from the date of the first commercial production from the unit well on February 1, 1947, through November 30, 1950, less taxes and less 15/320ths of the cost of drilling, completing, equipping and operating said well during such period, as located on the adjacent tract of land belonging to L. F. Dale in the 320-acre gas drilling unit.

The oil, gas and mineral lease in question was executed on December 29, 1939, by Bruce Walker and wife to John D. Gholson on this 50-acre tract in which the appellee Roy Beery now owns the 15/50th mineral interest, and the lease was transferred and assigned by Gholson during the year 1940 to the appellant, Superior Oil Company. Thereafter, on June 26, 1944, Bruce Walker and wife conveyed unto the appellee the said 15/50ths mineral interest in their 50-acre tract of land, subject to the outstanding oil, gas and mineral lease then held by the appellant.

The appellant's lease provides that "This lease shall be for a term of ten years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder."

It will be observed from a reading of the foregoing provision in the lease that there is no ambiguity therein. The primary term of the lease is stated in plain

and unequivocal language. It therefore becomes unnecessary for the Court to resort to any contemporaneous construction thereof by the parties and to their subsequent conduct in regard to this provision of the contract or to the conduct of the lessee in its subsequent dealings with the appellee Beery. In the absence of ambiguity, we must apply the language of the provision in the contract as written and as agreed upon by the parties thereto, subject to the applicable statutes for the conservation of oil and gas and the orders, rules and regulations of the State Oil & Gas Board, promulgated and adopted pursuant to such statutes.

The appellant's lease itself did not contain a pooling or *force majeure* clause. It was obtained of course subject to the police powers conferred upon the State Oil & Gas Board by Chapters 117, Laws of 1932, and 305, Laws of 1936, as was likewise the mineral deed from Bruce Walker and wife to the appellee, the lease having been executed during the year 1939 and the mineral deed in 1944, prior to the passage of Chapter 256, Laws of 1948.

The appellee sued specifically for the value of 1/8th of 15/320ths of the gas produced from the Dale well from the time it came into commercial production on February 1, 1947, until December 29, 1949, the date on which the lease was to expire by its terms, and for 8/8ths of the gas produced by said well thereafter prior to the trial. However, the amended bill of complaint contained a general prayer for the award of such damages as the court should find the complainant was entitled to recover. The trial court, however, awarded to the complainant 8/8ths of 15/320ths of the market value of the gas produced by the unit well on Dale's land on the basis that the 15/50ths of the 50-acre tract bears to the area of the 320-acre gas drilling unit from the time commercial production began therefrom, upon the theory that the law of co-tenancy was applicable to the situation since it was alleged that the gas had been produced from

the unit well on the Dale tract under and by virtue of the authority of the pooling agreements signed by the co-tenants of the appellee in the 50-acre tract, who owned the remaining 35/50ths mineral interest therein, executed on January 28, 1948, and March 25, 1948, subsequent to the granting of the permit to drill the Dale well, the filing and approval of the plat or map of the 320-acre gas drilling Unit No. 39, the pooling of the leases by the owners thereof pursuant to the orders of the Board of August 11, 1947, and September 11, 1947, and the granting and allocation of the allowables on December 9, 1947, effective December 26, 1947.

Although the appellee sued specifically for the market value of ⅛th of the royalty on the basis of his mineral acreage in the 320-acre unit, prior to the expiration of the primary term of the lease and for 8/8ths of such value thereafter, he predicates his right to recovery upon one of three stated grounds: (1) that he was entitled to recover on the ground that the appellant, as lessee of the 50-acre tract, had violated its duty under its lease not to impair the value thereof, in that it had drained, and is still draining, gas from the 50-acre tract through the unit well on the Dale tract; (2) that the lessee falsely, fraudulently, wrongfully and unlawfully represented to the State Oil & Gas Board that all of the lands proposed to be included in gas drilling Unit No. 39 had been lawfully pooled, and that the lessee thus obtained a full gas allowable on the 320 acres, including the 50-acre tract in question; and (3) that he is entitled to the recovery sued for under the law of co-tenancy for the reason that Bruce Walker and his several vendees (other than his vendee Beery) of mineral interests in the 50-acre tract had executed the amendments to the lease of the appellant hereinbefore mentioned, on January 28, 1948, and March 25, 1948, whereby they authorized the said lessee to pool this lease with the other lessees in the 320-acre unit and to pool their undivided 35/50ths of the minerals under the 50-acre tract with those of other

mineral owners and lessees in the drilling unit, and that it was pursuant to this authority that the appellant operated the unit well, obtained the allowables therefor and converted to its own use the appellee's rightful portion of the production of gas from the unit well.

As to the first contention, the only assumed obligation found in the lease whereby the lessee expressly agreed to protect the rights of the appellee and his cotenants in the leased premises, that is to say the 50-acre tract, from drainage, is in the following words: "In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 150 feet of and draining the leased premises, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances."

The Dale well was drilled at a distance of approximately 1,000 feet from the 50-acre tract in question which is situated in the SW¼ of Section 28, and it would seem that no obligation implied by law to protect the leased premises from drainage was violated where the same lessee also held a lease on the Dale tract and drilled the well thereon under the express authority of the Dale lease, and where under the conservation laws of the State, subject to which the appellee had purchased his mineral interest, the lessee of the 50-acre tract was prohibited from drilling an offset well thereon. In other words, since no express provision of the lease from Walker to Gholson was violated, it would seem that there would be no liability on the first theory of the amended bill of complaint, since the obligation implied by law to protect against drainage is inapplicable where the lawful rules and regulations of the State Oil & Gas Board for the conservation of oil and gas are complied with.

As to the second theory of liability relied on, it was necessary that the lessee who drilled the unit well should obtain an allowable for the entire 320 acres embraced

in the unit since the lessee would become liable to all of the owners of the respective tracts therein for their portion of the gas produced, on the basis of the allowable for all of the land in the unit on an acreage basis. Then, too, the issue of fraud and misrepresentation in regard to the establishment of the unit became foreclosed and res judicata under the decision of Superior Oil Company v. Beery decided on June 9, 1952, and reported in ...... Miss. ......, 59 So. 2d 689, which involved an appeal to this Court from the Circuit Court of Jefferson Davis County, wherein the validity of the establishment of the gas drilling Unit No. 39 was challenged. Moreover, the appellant asserts, and the record shows that as an oil and gas lessee it is one of the three "owners" who procured the unitization of the unit area, and then owned the gas under the 50-acre tract subject to the right of the appellee as a mineral vendee of the lessor to collect annual rental under the lease prior to production, to collect a $\frac{1}{8}$th royalty from the production of gas from the land on the basis of his 15 mineral acres, and subject to his right to the reversionary interest in fee of the minerals in the event there had been no production from the land under the lease during the primary term thereof.

We shall discuss the third theory of liability hereinbefore mentioned later in this opinion, other than to the extent of now stating that neither the appellee nor his co-tenants in the 50-acre tract were co-tenants in the sense of being entitled to share in the production from the unit well on the Dale tract except upon the theory that the 50-acre tract has been legally unitized or pooled with the other tracts in the 320-acre gas drilling Unit No. 39.

This brings us directly to a determination of whether or not this provision of the lease was actually complied with under the facts and circumstances hereinafter stated, within the meaning of Chapter 117, Laws of 1932, and Chapter 305, Laws of 1936, when read in connection with the lawful orders, rules and regulations of the

State Oil and Gas Board, promulgated during the year 1947, long prior to the expiration of the 10-year primary term of the lease in question on December 29, 1949.

The appellant also held the oil, gas and mineral lease on the Dale tract of land on which the well was completed on July 15, 1945, but due to the lack of pipe-line facilities to the Gwinville Gas Field, it so happened that this well, which later became the unit well for gas drilling Unit No. 39 was not placed in commercial production until February 1, 1947. Prior to the complete establishment of Unit No. 39, embracing the Dale tract of 160 acres, the Bruce Walker tract of 50 acres, and lands belonging to other separate owners, all of the ⅛th royalty was paid by the appellant to Mr. Dale, as owner and lessor of the land on which the well had been drilled.

On August 11, 1947, the State Oil & Gas Board adopted a rule and regulation which provided for a spacing unit of 320 contiguous surface acres for gas wells in the Gwinville Gas Field. On that same day, the State Oil & Gas Supervisor, acting on behalf of the State Oil & Gas Board, requested the appellant, as driller and operator of the Dale well, to file with the Board a plat or map of the lands to be included in the 320-acre unit for production of gas by this producing well, and for which a permit to drill had been granted in appellant's favor. This plat or map was accordingly filed on August 22, 1947, and was thereafter duly approved by the State Oil & Gas Board, together with the designation of such drilling unit.

On September 11, 1947, the State Oil and Gas Board adopted a state-wide rule and regulation which provided for gas drilling units of not less than 320 contiguous surface acres, upon which no other drilling or producing well could be located. This rule recognized that the Board could grant an exception thereto, and also to the rule adopted on August 11, 1947, as aforesaid, in regard to the Gwinville Gas Field, if such an exception "is necessary to prevent waste or to prevent the confiscation

of the property of the applicant.'' However, for reasons hereinafter stated, the granting of an exception would not have been justified on either of such grounds in the instant case.

At the time of the adoption of these orders of August 11, 1947, and September 11, 1947, the British Oil Producing Company and R. J. St. Germain, respectively, were also holders of oil, gas and mineral leases on different tracts of land covered by the plat or map that was ordered filed by the appellant, Superior Oil Company, and all of these oil, gas and mineral lessees were ordered by the Board to pool their leases, so as to develop 320 acres as a unit for the production of gas in the area to be embraced in gas drilling Unit No. 39.

These orders of the Board found and adjudicated as a fact the efficient drainage area of a gas well in the Gwinville Gas Field to be 320 acres; they provided for the establishment of such drilling units; they regulated the spacing of the wells; they provided the formula by which the well allowables would be determined, and allocated the same on an acreage basis; and they required that ''the rights of all owners in the drilling unit upon which the well is located shall first be pooled.'' The term ''owner'' is then defined in the order of September 11, 1947, as ''The person who has the right to drill into and to produce from a field or pool, and to appropriate the production either for himself, or for himself and another.'' Pursuant to this order of the Board, an operating agreement was duly entered into by these three lessees whereby the appellant was to operate the Dale Well No. 1 as the unit well on behalf of these owners of the leases, and also of course for the benefit of all parties interested as royalty owners in the lands involved.

On December 9, 1947, a 320-acre allowable for the production of gas was granted for gas drilling Unit No. 39, as requested by the appellant when it filed its plat or map on August 22, 1947, covering the SE¼ of Section 29 and SW¼ of Section 28 in Township 9 North, Range

18 West in Jefferson Davis County comprising the 320 contiguous surface acres. The order granting such allowable recited that the operators had filed the map or plat of the unit showing the acreage assigned to the same. The 320-acre allowable was allocated to the separately owned tracts on an acreage basis in the unit and the first monthly allowable was accordingly assigned and became effective on December 26, 1947, according to the orders of the State Oil & Gas Board in regard thereto. The foregoing acts of the State Oil & Gas Board and of the owners having the right to drill for the production of gas under their leases, completed the establishment of the said gas drilling Unit No. 39 and had the effect of unitizing the leases and pooling the same for the production of all gas thereafter from the well on the Dale tract of land.

When this unit had been thus established by the granting of the permit to drill, the filing of the plat or map of the lands to be included in the unit and the approval thereof, the pooling of the leases by the owners as required by the State Oil & Gas Board, and the granting of the 320-acre allowable and allocating the same to each separate tract of land therein on an acreage basis, in compliance with a valid exercise of the police powers of the State through the agency of the State Oil & Gas Board for the conservation of oil and gas, the owners of the leases, Superior Oil Company, British American Oil Producing Company and R. J. St. Germain, were thereafter deprived of the right to drill a well on any other tracts of land on which they held leases, other than the well on the Dale tract. While they were required to permit all of the other leases than the one on the Dale tract to expire by their terms, there was substituted for the right that they otherwise had to drill their leases the right to participate in the production of the unit well on the Dale tract and to receive the same proportion of the gas that they would have been entitled to receive if the well had been on a

tract on which they held a lease instead of the tract on which the Dale well was located. Thus it followed that the appellant, Superior Oil Company, was required to permit its lease on the Bruce Walker 50-acre tract to expire on December 29, 1949, unless the same was continued in force by the production of gas from the said 50-acre tract through the unit well on the adjacent Dale tract.

Likewise, there was substituted for the right of the appellee and his co-tenants in the 50-acre tract in which he owned 15/50ths of the minerals, to have a well drilled thereon during the 10-year primary term of the lease held by the appellant thereon, the right to receive the same amount of gas from the unit well as he would have been allowed to receive under the proration authorized by Chapter 305, Laws of 1936 if a well had been drilled on the 50-acre tract prior to the expiration of such primary term on December 29, 1949. This fact is uncontroverted in the record.

We recognize that as held in the case of Armstrong v. Bell, 199 Miss. 29, 24 So. 2d 10, and 3 Summers Oil & Gas, Permanent Ed. 486, Section 601, and in the cases of Koenig v. Calcote, 199 Miss. 435, 25 So. 2d 763, and Bailey v. Federal Land Bank, 207 Miss. 764, 43 So. 2d 375, the appellee had the right to receive the annual rents prior to production under the lease as provided for in his mineral deed from Bruce Walker and wife; the right to receive any royalties from production under the lease; and the reversionary fee interest in the minerals in place, to the extent of 15/50ths of the 50-acre tract in the event there was no production under the lease of the appellant during the life thereof. But the question here is whether or not the 50-acre tract was placed in production prior to the expiration of the primary term of the appellant's lease thereon in virtue of the unitization and pooling of all of the leases in Unit No. 39 and the allocation of the

320-acre allowable to each tract embraced in the unit on an acreage basis, prior to December 29, 1949.

All of the oil, gas and mineral lessees in the unit have received their pro rata $\frac{7}{8}$ths of the gas produced by the Dale well from and after the time the leases were unitized and pooled in the manner hereinbefore stated, and on the basis that their leased acreage bears to the 320-acre drilling unit. Likewise, all of the mineral or royalty owners, other than the appellee who refused the same except for compensation, have received their $\frac{1}{8}$th royalty from the production of the unit well on the basis that their acreage bears to the 320-acre drilling unit. Moreover, all of these mineral or royalty owners, other than appellee, have recognized the right of the State Oil & Gas Board to unitize their interests, and at the request of the oil, gas and mineral lessees they signed, without additional compensation, pooling agreements consenting to the development of their acreage as a unit along with that belonging to other mineral owners, and they thereby undertook to consent to the pooling of their mineral acreage with that of other mineral owners and the oil, gas and mineral lessees.

Included among those who thus signed what were termed amendments to the original oil, gas and mineral leases were the co-tenants of the appellee in the 50-acre tract, who owned 35/50ths of the minerals in place under the 50-acre tract, subject to the original oil, gas and mineral lease held by the appellant thereon. But in our opinion, the subsequent execution of this pooling agreement by the co-tenants of the appellee on January 28, 1948, and March 25, 1948, after the unitizing or pooling of the leases in the unit had been completed, was an unnecessary procedure in view of the fact that we later held in the cases of Superior Oil Company v. Foote on June 9, 1952, reported in ........ Miss. ........, 59 So. 2d 85, and Griffith, et al. v. Gulf Refining Co., 215 Miss. 15, 60 So. 2d 518, decided October 6, 1952, and Hassie Hunt Trust, et al. v. Proctor, et al., 215 Miss. 84, 60 So. 2d 551, decided Octo-

ber 13, 1952, that those having the exclusive right to drill for and produce oil or gas represent the royalty owners in the drilling and spacing of wells in compliance with the rules and regulations of the State Oil & Gas Board.

In the Foote case, supra, the appeal was from an order of the State Oil & Gas Board which undertook to "integrate" the interests of all lessees and mineral owners in the units there involved, the order having been rendered in a proceeding under Chapter 256, Laws of 1948, as amended by Chapter 220, Laws of 1950. But as a jurisdictional prerequisite for the Board to entertain the petition for integration, it was required that there should be two or more separately owned tracts of land embraced within an *established drilling unit,* and it was therefore necessary for the Board to find and adjudicate that the units had been theretofore duly and legally established. The Board did so find and we affirmed its action in so doing. We then pretermitted a decision of the question of whether or not the effect of the integration, which, according to all definitions to be found in standard dictionaries, means the same thing as to unitize or to pool, would be to extend the primary term of the lease, or whether the expiration of the date of the primary term prior to "compulsory" integration would have the effect of entitling the mineral owner, on whose tract of land no well had been drilled and was in production thereon, to receive 8/8ths of the gas instead of 1/8th after the expiration of the primary term of the lease which the mineral owner had given, or subject to which he had bought minerals under the lands described therein.

We are now confronted with the necessity of deciding this precise question in the instant case. In this connection, we are of the opinion that where the lands were unitized by the lessees and the leases were pooled, and the establishment of a gas drilling unit was completed under the authority of Chapter 117, Laws of 1932, Chap-

ter 305, Laws of 1936, and the orders, rules and regulations of the State Oil & Gas Board thereunder, the procedure had the same effect as would result from the integration of the mineral interests and the leases under the subsequent statutes of 1948 and 1950. In other words, we are of the opinion that if the lands in a drilling unit are unitized for the purpose of conserving oil and gas and of preventing waste and the drilling of unnecessary wells, and for the protection of the correlative rights of all persons included in the unit, all interests are thereby unitized; that they are thereby pooled; and that they are thereby integrated; that is to say, that to unitize is to pool, and that to pool the leases, as authorized by these two former statutes and the rules and regulations promulgated by the State Oil and Gas Board pursuant thereto, is to integrate the interests of the respective parties involved in the unit.

At any rate, this Court held in the case of Green, et al. v. Superior Oil Company, et al., ...... Miss. ......, 59 So. 2d 100, decided May 26, 1952, that where the wells were drilled and production begun on the units under the statutes in effect prior to Chapter 256, Laws of 1948, the applicable legislation is Chapter 117, Laws of 1932 and Chapter 305, Laws of 1936. All of the proceedings had and done in the instant case up to and including the making of the first monthly allowable and the effective date thereof was prior to the expiration of the primary term and during the year 1947, and therefore long prior to the expiration of the lease here involved, on December 29, 1949; and hence the governing statutes are those of 1932 and 1936, as held in the case of Green, et al. v. Superior Oil Company, et al., supra. In other words, we think that the decision in the Green case went a long way toward deciding the issue now before us. It cited the case of California Company v. State Oil & Gas Board, 200 Miss. 824, 27 So. 2d 542, 28 So. 2d 120, which held that "the 1932 and 1936 statutes had the effect of vesting in the Board the power to prescribe rules for the

spacing of oil and gas wells, and to regulate the drilling for and the production of oil and gas.'' And in the Green case, the Court further stated: ''We also think that the same statutes by necessary implication authorize the Board to establish drilling units.''

If the Board had the authority to establish drilling units and to require the oil, gas and mineral lessees to pool their leases, we think that it inevitably follows that each lessee is entitled to participate to the extent of 7/8ths of the production from the unit well on the basis that its leased acreage bears to the 320-acre drilling unit, less their pro rata share of the expense of drilling and operating the well and severance taxes, and that this cannot be true if all of the mineral owners in the unit other than Dale are given 8/8ths of the production of gas after the primary term of their leases expire, and on the basis that such mineral owner's acreage bears to the entire unit area. For instance, if the appellee is permitted to recover 8/8ths of 15/320ths of the value of the production of the gas from the Dale well, then the appellant would receive nothing from the appellee's 15 mineral acres, nor could the British-American Oil Producing Company and R. J. St. Germain, as oil, gas and mineral lessees receive 7/8ths of the production of the gas from the unit well on the basis that their leased acreage bears to the 320-acre unit, if their lessors could claim 8/8ths after the expiration of the primary term.

Moreover, unless the 160-acre tract on which the Dale well is located could share on behalf of Dale 1/8th of 160/320th of the gas drained from the 50-acre tract, upon the theory that the 160 acres has been unitized and pooled with the 50-acre tract, then he would be entitled under the law of capture to 1/8th of all the gas produced from the well on his 160 acres.

Thus, it will be seen that the correlative rights of the British-American Oil Producing Company and R. J. St. Germain, as lessees of other tracts in the unit, and those

of the appellant as the lessee of the 50-acre tract, and the royalty rights of all mineral owners, other than appellee, could not otherwise be protected and enforced; and that the result would be that the police powers of the state which are authorized to be exercised by the State Oil & Gas Board under Chapter 117, Laws of 1932, and Chapter 305, Laws of 1936, and under such reasonable orders, rules and regulations as the State Oil & Gas Board may adopt, would necessarily have to yield to the alleged right of the appellee to take 8/8ths of 15/320ths of the gas produced from the unit well on the ground that no well was drilled on the 50-acre tract, prior to the expiration of the primary term of the lease thereon, even though there is substituted for the right of the appellee to have had a well drilled on the 50-acre tract during the primary term of the lease the equivalent right of receiving the same amount of gas from the unit well that he would have been entitled to receive had a well been drilled on the 50-acre tract prior to the expiration of such primary term.

The right substituted in favor of the appellee, as above stated, has the effect of not taking away any valuable right of the appellee in violation of due process of law; whereas, on the other hand, if the oil and gas lessees are not permitted to share in the production of gas from the unit well on the basis that their leased acreage bears to the entire 320-acre unit, they are deprived of a constitutional right in violation of due process of law in that they were forbidden under the conservation laws of the State, as declared by the statutes last above mentioned and under the orders, rules and regulations of the said Oil & Gas Board adopted pursuant thereto, to drill a well on their leased acreage in the unit—a right granted unto said lessees under and by virtue of the contract provisions of their leases. They were required to pool their leases by the State Oil & Gas Board under the statutes and the orders, rules and regulations aforesaid,

and they had to do this whether their leases contained a pooling clause or not, because only one of the lessees could drill a well on any tract contained in the 320 acres in compliance with the public policy of the State for the conservation of its natural resources.

But it is urged by the appellee that the lessees could have protected themselves against this contingency by inserting a pooling clause in the respective leases, or by purchasing the right to pool from the mineral owners as an amendment to each original lease, or that they could have inserted in the original lease a force majeure clause. But we are of the opinion that the lessees were given the right to pool their leases, and were in fact required to do so, by the statutes involved and by the orders, rules and regulations of the State Oil & Gas Board thereunder; and that it was a reasonable exercise of the police powers of the state when the said Oil & Gas Board, the delegated agency of the legislature, adopted its spacing rule on September 11, 1947, requiring that "the rights of all owners in the drilling unit upon which the well is located shall first be pooled", and then defining the term "owner" in the said order as "The person who has the right to drill into and produce from a field or pool, and to appropriate the production either for himself, or for himself and another."

The observation last above made is true as a reasonable conclusion, because the State Oil & Gas Board usually has jurisdiction of oil, gas and mineral lessees when they undertake to drill an oil or gas well in the State, since they are thereby engaged in local activities and are subject to the jurisdiction of the Board, whereas it frequently occurs that the royalty owners in an oil or gas field in this State usually reside in a number of different states, and it would be difficult for the Board to require them to do anything in regard to observing the conservation laws in the development of an oil or gas field. Moreover, such mineral or royalty owners by the

execution of the oil and gas leases have divorced themselves from the operations for the production of oil or gas, reserving unto themselves only the right to receive the annual rental provided for in the lease, the royalty to accrue under the lease, and the reversionary interest in fee in the event there is no production from the land during the life of such lease.

It was insisted at the bar either in this case or the companion case of Superior Oil Company v. Alfred Foote, et al., No. 38,562, which has been considered along with the instant case, that the land or mineral owner whose property is under an oil, gas and mineral lease, is entitled to have a well drilled on the particular tract of land covered by the lease, as contemplated by the lease contract. Such right is only nominal at most, however, when it does not appear that it would be any advantage or convenience to the land or mineral owner to have the well located on his land instead of on an adjacent tract, and when he is given the right to receive the same amount of oil or gas from the unit well on the adjacent tract as he would have been allowed to receive under proration if a well had been drilled on his tract during the primary term of the lease. In other words, his damage, if any, resulting from failure to drill on his land under such circumstances would be *de minimis*. Moreover, in the case of Pace, et al. v. State, ex rel. Rice, Attorney General, et al., 191 Miss. 780, 4 So. 2d 270, this Court recognized that it would be to the disadvantage of a 99-year lessee of sixteenth section lands for an oil, gas and mineral lessee of a sixteenth section to have the right of ingress and egress to the leased premises to explore for oil and gas and to develop the land for the production thereof, and the Court declared that the surface lessee would be entitled to compensation for the damage that may be sustained to his surface rights on account thereof.

It follows from what is said in the foregoing paragraph that a land or mineral owner is not deprived of any

valuable property right in violation of due process of law because of the failure to produce oil or gas from his tract of land by a well thereon, when he is allowed to receive the equivalent thereof from a unit well on adjacent land in furtherance of the public policy of the State in the conservation of its natural resources. We recognize that in the absence of such laws enacted in the exercise of the police powers of the State, the appellee would have been entitled to the reversionary interest in his minerals after December 29, 1949, if no production of oil, gas or other mineral was had from a well on his mineral acres. But Chapter 305, Laws of 1936, made it the "duty of the Board to prorate and regulate the gas well production from each common source of supply . . ., for the protection of public and private interest, and to adjust the correlative rights and opportunities of each owner of gas in a common source of supply . . ." These conservation laws and regulations are based upon the theory that an individual having a right under given circumstances may exercise even the higher right of giving up the asserted right in the interest of the public welfare. Such was the philosophy of the moratorium statutes under which holders of mortgages and deeds of trust, giving unto them the right to foreclose in the default of a payment of an indebtedness, were denied the right to do so upon compliance with certain requirements not provided for in the contract of security.

An attribute of sovereignty, such as the police power of the state to conserve its natural resources, needs no constitutional sanction for its valid exercise; it is a power inherent in the existence of a government.

As to whether or not the reversionary interest in fee in and to the 15/50ths of the minerals under the 50-acre tract became vested in the appellee at the expiration of the 10-year primary term of the lease in question because of the failure of the lessee to produce oil, gas or other mineral from the tract prior to December 29, 1949, it

should be observed that the theory of the conservation laws in the spacing of gas wells is that one gas well will efficiently drain a 320-acre unit. Moreover, it is alleged in the amended bill of complaint that the Dale well was in fact draining gas from the 50-acre tract prior to December 29, 1949, which is the equivalent of alleging that it was producing gas from said tract. The precise contention of the appellee, however, is that it was not producing gas *under the lease thereon,* but we are of the opinion that when leases on various tracts of land are pooled in a unit, the gas from each separate tract is being produced by the unit well so far as the particular tract is concerned under and by virtue of the lease thereon, and that likewise the gas from each of the other tracts in the unit is being produced by such well under and by virtue of the lease on each of such tracts, all of which have been pooled into a whole or unitized; and that therefore the gas, the value of which is sued for in this case, was being produced prior to the expiration of the primary term of the lease under and by virtue thereof.

While the appellee does not sue specifically for the benefits resulting from the unitization or pooling of the leases, and does not concede that he ratifies the same, he does sue for 15/320ths of the value of the gas upon the stated ground that to such extent he has been damaged in that the gas produced by the unit well in part has been drained from the 50-acre tract. It is unnecessary for us to hold that the bringing of the suit had the effect of ratifying the unitization or pooling of all of the mineral interests in the unit, or that we base our decision upon any theory of ratification, but we think that the facts alleged and proved do sustain the theory that the gas, the value of which is sued for as damages to the complainant, was in fact drained or produced from the 50-acre tract through the unit well, and that all of the lands in the unit were placed in production under the theory and philosophy of the conservation laws, and also

in reality, prior to the expiration of the primary term of the lease in question.

We are not unmindful of the holding of the numerous authorities cited by the appellee to the effect that the Court must give effect to the terms of the lease as written, but for the many reasons hereinbefore stated we have reached the conclusion that there was no failure of production of gas from the 50-acre tract under and by virtue of the lease thereon prior to the expiration of the primary term thereof. None of the mineral owners whose interests are involved in the unit are entitled to any portion of the production of gas from the Dale well except upon the theory that it was producing gas from their several tracts of land under and by virtue of the oil and gas conservation laws. The extent of their participation in the production from the unit well is controlled by the terms of the leases on each respective tract which declare the extent to which they are entitled to participate in any production. Beyond question, it is true that Dale would be entitled to ⅛th of all the production from the unit well unless his land has been pooled with the other tracts in the unit, since the State Oil & Gas Board has not recognized the unit except as embracing 320 acres. No factual basis is disclosed in the record that would have justified the granting of exceptions as to any particular tract in the unit since the same is composed of two quarter sections which make a perfect unit of 320 contiguous surface acres, and no complaint is made as to the size or shape of the unit as approved and established, or as to the location of the unit well thereon.

In the case of Griffith, et al. v. Gulf Refining Company, supra, the appellants were mineral owners and had signed no pooling agreements. The Gulf Refining Company held a lease on 250 acres and obtained an allowable upon that acreage to drill and develop the same as a unit. Griffith and others were mineral owners

under 90 acres thereof and the Gulf Refining Company drilled its well on the remaining 160 acres and sought to deny to the appellants, Griffith and others, the right to participate in the production of the well on the 160 acres in which they held no mineral interest. The Court held that the appellants were entitled to participate in the production of the well on the basis that their mineral interest bears to the 250-acre drilling unit. It is true that the Court did not hold that this was the extent of the right of the appellants, Griffith and others, that being all they sued for, but the Court did recognize that all persons owning the mineral interests in an established drilling unit were entitled to participate in the production from the unit well, on the basis of their respective acreage. Such was the right of the appellee in the instant case, and the remaining question still is whether this was the full extent of his right or whether he is entitled to 8/8ths of 15/320ths or ⅛ thereof.

In the case of Hassie Hunt Trust, et al. v. Proctor, et al., 215 Miss. 84, 60 So. 2d 551, the appellant, Hassie Hunt Trust, drilled a producing oil well on the north 30 acres of a 40-acre tract on which 30 acres it held an unquestioned lease, whereas the appellees, Proctor and others, held a lease on the south 10 acres of the 40-acre tract. There was no pooling agreement, but the Court held that when the appellant drilled on the 30 acres and obtained an allowable on the 40 acres as a drilling unit it became liable to account to the appellees for ¼th of ⅞ths of the production from the 40 acres, less ¼th of the cost of drilling, equipping and operating the well and less ¼th of the operator's ⅞ths of the severance taxes.

It is true that neither of these two cases involved the question of the right of a mineral owner to receive 8/8ths of the production after the expiration of the primary term of a lease, but the point is that the Court nevertheless allowed Griffith and others in one case,

as mineral owners, and Proctor and others in the other case, as lessees, a part of the production upon the ground that the unit well *was producing gas from their portion of the land* in each instance, even though it was located on an adjacent tract; and that is the issue we have before us in determining whether or not there was production from the 50-acre tract in question while the same was under a lease.

- The Court cites the case of Placid Oil Company v. North Central Texas Oil Company, 19 So. 2d 616, from the Supreme Court of Louisiana, in the Griffith and Hassie Hunt Trust cases, supra. That case involved a dispute over the ownership of the ⅛th royalty. Briefly the facts were that Parten owned the royalty in Tract A and the North Central Texas Oil Company owned the royalty in Tract B. Each tract was under lease to Hunt Oil Company and contained forty acres. The spacing rules provided for 80-acre drilling units consisting of two adjacent 40-acre tracts. The lessee applied for a permit to drill and filed a plat of the 80-acre drilling unit comprising both Tracts A and B. The permit was issued and the well was drilled on the tract owned by Parten. He claimed all of the royalty because the well was on his tract and there was no pooling order as to the royalty and no voluntary agreement. The Court held that the royalty owners in each tract were entitled to their share of the production from the unit well. The lessee had been ordered by the Commissioner of Conservation to combine the two 40-acre tracts and the Court held that the effect of the Hunt Oil Company obtaining the permit to drill and the order of the Board to combine the two tracts into a unit "was in fact a unitization of the two 40-acre tracts", and the Court further said:

"The effect of the order was to substitute for the right of every owner of a mineral interest in a tract of land having an area less than 80 acres—to receive all of his proportionate share of any oil or gas that might

be produced from the Bodcaw sand through a well drilled upon the land in which he owned the mineral interest —the right to receive only his proportionate share of any oil or gas produced from the Bodcaw sand through a well drilled upon an 80-acre drilling unit embracing the land in which he had his mineral interest.''

But especially in point is the case of Hardy v. Union Producing Company, (La.) 20 So. 2d 734, wherein the Court said: ''Plaintiffs' argument is not tenable because the defendants in reality have not failed to perform any obligation of their contract. There was no obligation resting upon the defendants to drill a well during the primary term of the lease in the circumstances of this case according to a reasonable interpretation of the contract. If the contract should be annulled, plaintiffs could not drill a well on their 47-acre tract of land because it forms a part of the 640-acre drilling unit on which a well drilled by the Southern Production Company, Inc., is producing gas in paying quantities. Plaintiffs, as the owners of the leased premises, are entitled to receive the same revenue as they would receive if the well located in the Northeast Quarter of the Northwest Quarter of Section 11 was located on their 47 acres in Fractional Section 10. In other words, if the well of the Southern Production Company, Inc., was located on plaintiffs' 47-acre tract of land in Fractional Section 10, the production would be prorated among all the owners of the mineral rights in the drilling unit in the same proportion in which the production is now being distributed. . . .

''So in this case, the clause in the lease requiring defendants to drill a well on the leased premises within the primary term of five years is not applicable where a well producing gas in paying quantities has been drilled on land within the drilling unit of which the leased land forms a part and where the lessee is prohibited by orders of the Department of Conservation from drilling a well on the leased premises. In other words, the right

of defendants to drill a well on the 47-acre tract covered by the lease was in effect taken away from them by the orders of the Commissioner of Conservation, with, however, the right reserved to them, as well as to the plaintiffs, to share in the production of the gas produced from the unit in proportion to their ownership. Defendants' hands were literally tied as the result of the orders issued by the Commissioner of Conservation and they could do nothing whatsoever to prevent the primary term of the lease from expiring without drilling a well thereon."

We think that whether a drilling unit has been established under constitutional provision or under valid statutes of the Legislature and the orders, rules and regulations enacted and adopted pursuant to the constitutional police power of the State, the effect of the unitization or pooling of leases should be the same. Moreover, ██ it is the duty of the Court to give our conservation statutes, and the measures adopted thereunder by a state agency created by the Legislature to carry out the public policy of the State, such a construction as would reasonably render the same constitutional and valid. The Court sustained their constitutionality on the former appeals involving this and other gas drilling units in the Gwinville Gas Field. Unless requiring oil and gas lessees to pool their several leases in a given area and to develop the area as a unit with only one producing well thereon has the effect of unitizing or pooling the respective interests of the mineral owners in the area, then the requirement for the pooling of the leases cannot be upheld as constitutional unless such action has the effect of placing all of the lands in the unit in production and extending the primary terms of the leases. Otherwise, only the lessee on the tract on which the producing well is drilled could receive any benefit from the leases in the unit.

In the instant case, the appellant, Superior Oil Company, expressly concedes in the concluding paragraph of

its original brief that a judgment should be entered here in favor of the appellee, Roy Beery, for 1/8th of 15/320ths of the market value of the gas produced from the Dale well from the date of first commercial production on February 1, 1947, to November 30, 1950, less severance taxes paid thereon, and we must therefore assume that the appellant would further concede that the appellee is entitled to the same relief from and after November 30, 1950, as to the gas being produced from the Dale well. But compare Wood Oil Company, et al. v. Corporation Commission, et al. (Okla.) 239 P. 2d 1023.

The appellant contends that it has been willing at all times to settle with the appellee according to its above concession, but it made no tender of this portion of the gas except on condition that the appellee would sign an amendment to the original lease, and this portion of the gas was not unconditionally tendered unto the appellee in the pleadings. We are of the opinion that the defendant, Superior Oil Company, could not have relieved itself of the cost in the trial court proceedings without having made an unqualified tender of the amount to which it now concedes the complainant was entitled to receive.

From the foregoing views, it follows that the decree of the trial court in cancelling the appellant's claim under its lease and awarding the complainant 8/8ths of 15/320ths of the gas produced from the Dale well from and after the same came into commercial production was error, and that the cause should be reversed and remanded in order that it be ascertained what sum of money the complainant is entitled to receive on the basis of 1/8th of 15/320ths of the gas from and after commercial production on February 1, 1947, by the unit well.

But it is strongly urged on behalf of the appellee that to thus limit the portion of gas that he is entitled to receive from the date the unit well came into commercial production, and throughout the period that the same may remain in production, is to hold that the State Oil

& Gas Board had the power and authority prior to the enactment of Chapter 256, Laws of 1948, to force him to pool his mineral interest with other such interests in the established unit, and that there is no provision in the prior statutes whereby such power and authority is expressly conferred upon the Board. In response to this contention, it may be said that it is likewise true that neither the Acts of 1932 nor 1936 expressly authorized the establishment of gas drilling units as large in area as 320 acres or that the oil and gas lessees in such an area could be required to pool their leases and develop the area through production from only one well. Nevertheless, we upheld the right of the Board to exercise such authority as a necessary incident to the prevention of the waste of gas and to protect the common source of supply thereof under the 1932 Act, and to prorate and regulate the gas well production from each common source of supply for the protection of public and private interests, and to adjust the correlative rights and opportunities of each owner of gas in a common source of supply under the Act of 1936, when we decided the cases of Green, et al. v. Superior Oil Co., ...... Miss. ......, 59 So. 2d 100; Superior Oil Company v. Beery, ...... Miss. ......, 59 So. 2d 689; Superior Oil Company v. Foote, ...... Miss. ......, 59 So. 2d 85; Superior Oil Company v. Morgan, et al., ...... Miss. ......, 59 So. 2d 105; Superior Oil Company v. Foote, ...... Miss. ......, 59 So. 2d 844, and Hutchins, et al. v. Humble Oil & Refining Company, ...... Miss. ......, 59 So. 2d 103.

In the Green case, supra, we said: "In California Company v. State Oil & Gas Board, 1946, 200 Miss. 824, 27 So. 2d 542, 28 So. 2d 120, this Court held that the 1932 and 1936 statutes had the effect of vesting in the Board the power to prescribe rules for the spacing of oil and gas wells, and to regulate the drilling for and production of oil and gas. We also think that the same statutes by necessary implication authorized the Board to estab-

lish drilling units. This interpretation is supported by the California Company case, where the court implied the power to provide for the spacing of wells. See also Cities Service Gas Company v. Peerless Oil & Gas Company, 1950, 203 Okla. 35, 220 P. 2d 279, affirmed in 340 U. S. 179, 71 S. Ct. 215, 95 L. Ed. 190; . . .'' And what we are now holding is that the effect of the establishment of a drilling unit of a given area and the prevention of the drilling of more than one well thereon is to necessarily pool the rights of the oil and gas lessees and all of the mineral rights in such area, because any other result would mean that only the oil and gas lessee that drilled the unit well could receive any portion of the $\frac{7}{8}$ths of the gas produced therefrom, and only the owners of the minerals under the particular tract on which the well is drilled could receive any portion of the royalties from production, since it is only upon the theory that all other interests of the oil and gas lessees and of all other royalty interests have been pooled with the Dale tract that they can participate in the production from the Dale well.

However, it is further urged that the oil and gas lessees could pay the royalty owners enough to get them to voluntarily agree to the pooling of their mineral interests. But this contention overlooks the fact that the operation of a unit well for production of gas in a given area would be left to the will and pleasure of the mineral owners, some of whom may not be willing to agree to anything at any price. We think that when the Court, in the cases above enumerated, upheld the orders of August 11, 1947, and September 11, 1947, the last of which orders defined an ''owner'' who could be required to pool, as ''The person who has the right to drill into and to produce from a field or pool, and to appropriate the production either for himself, or for himself and another,'' it then followed that we must go further and hold that requiring the oil and gas lessees to pool

their leases in an established unit has the effect of extending the primary term of such leases, (a question that we pretermitted in those cases), since we are confronted with the fact that a well can be drilled only on one tract covered by a lease in the unit; that the pooling of the leases also has the effect of pooling the mineral interests of the royalty owners, for the reason that in no other way can the constitutional rights of the other oil and gas lessees in the unit be protected. As hereinbefore stated, ▇▇ no valuable right will be thereby taken from the mineral owner since there is substituted for his right to have a well drilled on the tract under which he owns his minerals the right to receive the same portion of gas from the unit well that he would have been entitled to receive if a well had been drilled on his acreage, or on the tract in which he owns an undivided mineral interest, during the primary term of the lease; and it appears that Chapter 256, Laws of 1948, as amended by Chapter 220, Laws of 1950, merely spelled out how and by what procedure the several interests in an established drilling unit could be unitized, pooled or integrated from and after the enactment of these two later statutes, and which statutes do not affect the instant case.

Moreover, under these two later statutes if the owners of two or more separately owned tracts cannot agree, then the right is given to the State Oil & Gas Board to "integrate" the several interests, and in such event there is no defense available to the objector if the unit has been legally established and one of the owners of a separately owned tract in the unit is unwilling to agree to his mineral interest being unitized, pooled or integrated with the others.

Under the conservation laws hereinbefore discussed, an oil and gas lessee in a proposed drilling unit may obtain an exception to the general spacing rule where the granting of such an exception would prevent waste or the confiscation of the property of the applicant, but in

the instant case neither of the oil and gas lessees requested that an exception be granted, and it does not appear from the record that an exception would have been justified on the grounds above stated. We do not think that it was contemplated that the owner of an undivided mineral interest in one of the several tracts involved in a unit would be entitled to have an exception granted and a well drilled on the tract for the benefit of his undivided interest where his co-tenants in the tract are exercising their right to receive a portion of the production from the unit well. Again we say that the appellee cannot claim a portion of the value of the total production from the 50-acre tract without according to Dale the right to receive a portion of the gas drained from the 50-acre tract. This cannot be if the appellee receives 8/8ths of the gas produced from his mineral interest therein.

Moreover, we rejected the contention (by a failure to respond thereto on Suggestion of Error) in the case of Hassie Hunt Trust, et al. v. Proctor, et al., supra, that Proctor and others could have petitioned for an exception as to the 10 acres on which they held a lease in a 40-acre oil drilling unit there involved, there being no reason for the granting of such an exception. Nor did we hold in the case of Griffith, et al. v. Gulf Refining Co., et al., supra, wherein the appellants were mineral owners, that an exception should have been obtained for a well on the 90-acre tract which was a part of the 250-acre unit on which the permit for a well had been issued to drill as a unit.

This opinion has been prolonged to great length, both because of the importance of the questions involved and the necessity for studying nearly seven hundred pages of briefs and a voluminous record in this and the companion case with the view of obtaining the benefit of the thought and research given to each case by all of the several firms of attorneys interested. Naturally, it has

been impossible to discuss herein more than a few of the cases relied on in the briefs, but we have undertaken to discuss the controlling issues in the light of all the cases deemed to be of most value and in the light of the views of the participating judges as expressed in conference.

Reversed and remanded.

*Roberds, Kyle, Holmes, Arrington, Ethridge* and *Lotterhos, JJ.,* concur. *Lee, J.,* dissents. *Hall, J.,* who considered himself disqualified, took no part.

---

LEE, J., dissenting:

Under the terms of the contract here involved, the lease was for a term of ten years, "and as long thereafter as oil, gas or other mineral is produced from said land hereunder." There was no provision for production by operation of law, as might be contemplated from forcible pooling. The only kind of production allowed for was "hereunder," that is, under this lease contract. Obviously the draining of gas from this land incidental to a well nearby was not within the contemplation of the parties at the time of the execution of the lease. And since no well was drilled on this acreage during the ten-year period, there was no production from this land "hereunder." Consequently, on December 29, 1949, the expiration date of this lease, Beery's 15/50ths reversionary interest became complete.

In the case of Koenig v. Calcote, et ux, 199 Miss. 435, 25 So. 2d 763, Calcote and wife, on October 4, 1935, executed a deed to Koenig for an undivided one-half interest in all oil, gas and minerals under 238 acres, subject to an outstanding oil and gas lease held by Sun Oil Company, executed on October 12, 1934, for a primary term of ten years. The land was not in production at the expiration of the primary term. This Court held that Koenig, under his deed, acquired "An undivided one-half interest in the reversionary fee in the minerals in place

and that upon the forfeiture of the outstanding oil and gas lease in favor of Sun Oil Company, this interest ripened into a fee simple title in a one-half undivided interest in all of the oil, gas and other minerals in place . . ." See also Bailey v. Federal Land Bank, 207 Miss. 764, 43 So. 2d 375; 3 Summers Oil & Gas, Permanent Edition, Section 601, p. 486; Parten v. Webb, 1 So. 2d 76, 197 La. 197; 31A Texas Jurisprudence, Section 158, p. 276; Earp v. Mid-Continent Petroleum Corporation, 27 Pac. 2d 855, 91 A. L. R. 188.

But the majority opinion holds that the State Oil & Gas Board had the power, under Chapter 117, Laws of 1932, and Chapter 305, Laws of 1936, to adopt its orders of August 11, 1947, and September 11, 1947, and thereby integrate and forcibly pool Beery's interest in this particular drilling unit.

It should be borne in mind that the Constitution of 1890, which, by Section 6, Article 3, thereof, recognizes the police power of the State, also contains a prohibition against the impairment of contracts, for Section 16, Article 3 thereof provides as follows: "Ex post facto laws, or laws impairing the obligation of contracts, shall not be passed."

It is my view, with the greatest deference, that neither of the foregoing chapters delegated to the Board the power to force owners in a given unit to pool their interests. To this end, an analysis of the applicable provisions of those chapters is in order.

The powers granted to the Board are set out in Section 5 (a), Chapter 117, supra, the applicable part of which is as follows: "The Board hereby created shall have authority to adopt and promulgate such rules and regulations as may be reasonable and proper and as it may deem necessary for the conservation of crude oil or petroleum and/or natural gas produced in the State of Mississippi and to provide such rules and regulations for the drilling, development, sinking, deepening, aban-

donment and operation of oil and gas wells as may be necessary to prevent the waste of such products and to protect the common source of supply.''

In this grant of power, nothing whatever is said about pooling, forced pooling, or integration.

Evidently in an effort to encourage the discovery and production of gas, by Section 38 of said chapter, the percentage of the open flow capacity that gas wells may be allowed to produce, and the sizes of tracts and the volume of flow permitted were fixed for 160, 80, 40, 20, 10, 5, and less than 5, acres. And the twelfth paragraph of said Section 38 provides for the location of the well on a given acreage, and for the drilling of offset wells, and that ''such offset well or wells shall be allowed to produce the same percentage of open flow capacity as the well or wells so offset.''

Not only is there no provision in Chapter 117, supra, which authorizes forced pooling, but, on the contrary, the language of Section 40 thereof is at complete variance with the idea of forced pooling, and, in my opinion, is positive proof that forced pooling was not within the contemplation of the Legislature, because that section encourages voluntary agreements between operators and royalty holders and declared that, when such agreements are approved by the Board, they shall not be held to violate the statutes relating to monopolies or contracts and combinations in restraint of trade. This section is as follows: ''Agreements made in the interest of conservation of oil and gas, or the prevention of waste, between and among operators owning separate holdings in the same oil and gas pool, or in any area that appears from geological or other data to be underlaid by a common accumulation of oil and gas, or both, or between and among such operators and royalty owners therein for the purpose of bringing about the development and operation of said pool, or area, or any part thereof, as a unit of establishing and carrying out a plan for the cooperative development and operation thereof, when such

agreements are approved by the Board, are hereby authorized and shall not be held or construed to violate any of the statutes of this State relating to monopolies or contracts and combinations in restraint of trade."

Chapter 305, supra, merely amended Section 9, Chapter 117, supra, so as to provide a detailed method for the proration of gas and oil production.

It is true that in California Company v. State Oil & Gas Board, 200 Miss. 824, 27 So. 2d 542, it was held that the Board had the power to prescribe the general rule and regulation as to the spacing of oil and gas wells and to provide for exceptions thereto under given circumstances. In other words, the Board could prescribe the requisite number of acres for a gas unit. The opinion dealt solely with the proposition of spacing, and neither expressed nor implied that the Board could coerce or require the owners in a unit to pool their interests. Compare Dailey v. Railroad Commission, 133 S. W. 2d 219, where the Court of Civil Appeals of Texas said: "If it be assumed that the conservation statutes authorize the Commission to require pooling of acreage and that such pooling is not inhibited by the fundamental laws of both the state and nation, upon which question we do not pass, a complete answer to the pooling contention is that the spacing rule in question does not provide for the pooling of lands. . . . The Commission can not arbitrarily require any pooling of acreage where it has no rule or regulation prescribing and defining pooling . . ."

As against the contention that forcible integration and pooling should be implied, I find myself impressed by the fact that, although amendments to this effect were introduced in the Legislature during the 1940, 1942, 1944 and 1946 Sessions, in each instance, such amendments failed of passage. While there is authority to the contrary, "Courts construing a statute will take judicial notice of an attempted amendment thereof which failed

of passage, as indicative of legislative policy . . ." 31 C. J. S., Evidence, Section 16, pp. 528-9.

Moreover, the first enactment of the Legislature, which expressly authorized forcible pooling and integration, is found in Section 10 (a), Chapter 256, Laws of 1948. It was there provided that when the persons owning the drilling rights and the rights to share in the production from an established drilling unit "have not agreed to integrate their interests, the Board may, for the prevention of waste or to avoid the drilling of unnecessary wells *as to a drilling unit of forty acres in area or less, but as to no drilling unit of greater area, require such persons to integrate their interests and to develop their lands as a drilling unit.* (Emphasis supplied.) That section not only did not delegate to the Board authority to require integration of drilling units of more than forty acres, but actually prohibited such forced integration. And it was not until the passage of Chapter 220, Laws of 1950, under Section 3 thereof, after the expiration of the lease in this case, that the Legislature delegated to the Board the power to integrate interests without reference to the number of acres in the unit.

Besides, if the Acts of 1932 and 1936, supra, in fact authorized compulsory integration and pooling of interests, then the subsequent Acts of 1948 and 1950, supra, were indeed vain and useless enactments. On the contrary, the very passage of these later Acts, to me, is convincing proof that the Legislature deemed that it had not, by the earlier Acts, delegated to the Board the power to compel owners in a given unit to pool their interests.

Thus, if it can be said that the effect of the August 11, 1947, and September 11, 1947, orders of the Board was to integrate and pool Beery's interest in this unit, then such orders should be declared ineffectual to accomplish those purposes, because the Board had not theretofore been invested with such power by the Legislature.

In Price v. Harley, 142 Miss. 584, 107 So. 673, it was said that: "The obligation of a contract imports, for the most part, its binding force upon the obligor to perform the duty agreed on, according to the nature and effect of the contract . . . The nature, construction, and effect of a contract are governed by the laws existing when and where it was made . . ."

The majority opinion advances the proposition that the requirement of 320 acres for a drilling unit prohibited the appellant from carrying out its contract, and, unless the orders of August 11, 1947, and September 11, 1947, pooled these interests, it would be unjustly deprived of its property rights.

One answer to this contention is that the Board could, and did, make exceptions to the spacing pattern. It appears that, in this same field, Gulf Refining Company drilled 22 wells, and 20 of them were exceptions; Humble Oil & Refining Company drilled 32 wells, and six of them were exceptions; and that appellant drilled 17 wells, but that not one of them was an exception. In other words, the appellant, according to this record, made no effort whatsoever to obtain exceptions, and thereby prevent the confiscation of its property rights.

Another answer is that appellant made a solemn contract by which it agreed that, if it did not produce gas and oil from the land under this lease within ten years, its rights therein would cease. See Section 16, Article 3, Constitution of 1890, supra.

In Harmon v. Fleming, 25 Miss. 135, wherein two slaves were hired for a year and both of them died during the year, it was held that, since the parties knew, at the time of making the contract, that the slaves were subject to death before the expiration of the service, in the absence of a stipulation for an abatement of price in the event of death, there was no legal right to demand an abatement. The opinion stated the common law rule as follows: "Where the law casts a duty on a party, the performance shall be excused, if it be rendered im-

possible by the act of God. But where a party, by his own contract, engages to do an act, it is deemed to be his own fault and folly, that he did not thereby expressly provide against contingencies, and exempt himself from liability in certain events; and in such case, therefore, that is, in the instance of an absolute and general contract, the performance is not excused by an inevitable accident or other contingency, although not foreseen by, or within the control of the party.''

In Piaggio v. Somerville, 119 Miss. 6, 80 So. 342, it was held that the risk from unrestricted submarine attacks did not release from the contract to deliver a shipload of lumber, for it was said that: ''the rule is that when a party by his own contract creates a duty or charge upon himself he is bound to discharge it, although so to do should subsequently become unexpectedly burdensome or even impossible; the answer to the objection of hardship in all such cases being that it might have been guarded against by a proper stipulation.''

In Chism, et ux. v. Hollis, et al., 152 Miss. 772, 118 So. 713, as regards the enforcement of contracts, this Court said: ''This lease imposes a possible burden on appellants' land. The parties were legally capacitated to contract. This Court does not make contract for such parties, and, under such circumstances, cannot substitute its opinion of what would be advantageous to the parties for their solemn agreement, and, whether wise or unwise, the parties must remain bound thereby. To hold otherwise would, in a measure, constitute the Court the guardian of the unwise. This step we cannot take.''

In Bradley v. Howell, 161 Miss. 346, 134 So. 843, this Court said: ''The province of courts in respect to contracts extends not a single step farther than the enforcement thereof as made by the parties, and courts must be careful that they go no farther. If the court should fail in enforcement, it would be only failure or omission; but, if upon any procedure or pretext the court

should go farther and make a contract between parties which they themselves never made or agreed upon and thereupon enforce the same as made by the court, this would be oppression."

In Browne v. Bryan Lumber Company, 188 Miss. 71, 194 So. 296, where the contract for the sale of crossties provided that they were to be shipped by water, it was held that even though it became impossible for the seller to ship by water, such fact did not relieve performance of the contract as regards his liability to a broker for his commission, and cites Harmon v. Fleming, supra, and Piaggio v. Somerville, supra, with approval.

The lease contained no provision for the preservation of the rights of appellant in event of governmental intervention or limitation or frustration whereby the performance of the contract might become impossible of fulfillment. In my opinion, such failure on the part of the appellant so to stipulate does not justify this Court in making for it a contract which it did not see fit to make for itself. Harmon v. Fleming, supra; Piaggio v. Somerville, supra.

The case of Berline v. Waldschmidt, 156 Pac. 2d 865, decided by the Supreme Court of Kansas on March 10, 1945, is directly in point. In that case Berline acquired a lease which had been executed by Waldschmidt on May 27, 1939, for one-half of the minerals on a 5-acre tract. The lease was to run for a period of five years and as long as oil and gas should be produced from the premises. This lease was also subject to an outstanding oil and gas lease, and Berline had no right to develop under his lease until after the expiration of the prior lease on November 15, 1943. He sought an extension because he was prevented by governmental rules and regulations from drilling. The opinion of the Court, in applying the doctrine of commercial frustration, said that: "it is predicated upon the fundamental premise of giving relief in a situation where the parties could not reasonably

protect themselves by the terms of their contract against contingencies which later arose, and that it never applies to give such relief where the risk of the event that has supervened to cause the alleged frustration was reasonably foreseeable and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement which it is contended should be supplemented through operation and application of the doctrine. If the events relied upon as bringing the doctrine into force and effect appear to have been reasonably foreseeable and controllable by the parties they may not invoke its principles as a defense to escape their obligations and the contract is enforceable in accordance with the provisions to be found therein.''

The opinion further referred to the laws in force in that state at the time of making the contract to-wit: ''On the date of the execution of the mineral deed there was in force and effect (Laws 1939, Ch. 227, now G. S. 1943 Supp. 55-602 to 55-509 (b), incl.), regulating the production of oil in Kansas, and giving the Corporation Commission of the State authority to make and enforce rules, regulations and orders, in connection therewith. Prior to that time and as early as 1931 Kansas had recognized the necessity of conservation and elimination of waste and from that time down to 1939 comprehensive legislation had been enacted regulating and insuring the production of crude oil and natural gas without waste. . . . So, at that time, it must be concluded the appellant knew, or if he did not know he was bound to know, that the laws of Kansas permitted the spacing of oil wells in a manner similar to that subsequently provided for by the federal legislation which resulted in the situation described in his petition.'' See also Gas Ridge, Inc. v. Suburban Agricultural Properties, Inc., 150 Fed. 2d 363, a Texas case.

The difference in the relative positions of the appellant and the appellee is that spacing, under the Acts of 1932 and 1936, supra, was reasonably foreseeable at the time of the execution of the lease. Appellant should have, therefore, anticipated that it would meet with just such a situation as now obtains, and to that end, should have contracted against such eventuality. So, while spacing, or a pattern for drilling, was reasonably foreseeable, there was no provision in either of those Acts whereby the several owners of interests in a drilling unit could be forced to pool their interests. As I see it, no restriction or limitation whatever on their freedom of contract is to be found in those Acts. Thus, the appellee could not reasonably foresee that his contract would be impaired and his interest forcibly pooled, inasmuch as the Legislature, in those Acts, delegated no such power to the Board.

The appellant knew about Beery's interest prior to, and at the time of, drilling the well, if it made any investigation of the land records. It knew that, in accordance with the contract, he would have a 15/50ths reversionary fee interest on December 29, 1949. It was in the same position in this regard as Hassie Hunt Trust was in Hassie Hunt Trust v. Proctor, 215 Miss. 84, 60 So. 2d 551, namely that the Proctors were claiming a lease on the south ten acres of the forty involved. In that case, this Court held that the Hassie Hunt Trust was liable to the Proctors for a $\frac{1}{4}$th interest in the production from the oil well, less $\frac{1}{4}$th of the cost of drilling and maintenance thereof. In my opinion, if the Court should follow that case, it would be necessary to affirm this one.

The appellant has changed its position completely since the original hearing before the State Oil & Gas Board, and which was heard by this Court under the style of Superior Oil Company v. Beery, ....... Miss. ......., 59 So. 2d 689. The appellant recognized the necessity of obtaining voluntary pooling agreements, and secured

such agreements from all interested parties except Beery. Failing in this particular, it then sought forcible integration, under the provisions of Chapter 220, Laws of 1950. In the case now before us, however, it now contends that it was unnecessary to obtain such pooling agreement from Beery, and on the contrary, his interest had theretofore been pooled by operation of law. The majority opinion holds, however, that these positions are not inconsistent.

In Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85, the Court upheld the validity of Section 10, Chapter 256, Laws of 1948, as amended by Section 3, Chapter 220, Laws of 1950, under which the State Oil & Gas Board was authorized to require the owners in an oil or gas drilling unit to pool and integrate their interests to prevent waste or the drilling of unnecessary wells. In the opinion in that case the Court said this: "The Board's order integrated the interests of appellees and all other owners, and correctly stated that it did not adjudicate what those interests were, that is, whether the establishment of the drilling units or the order of integration had the effect of extending or reinstating the primary terms of the leases. Hence we do not consider or decide those questions. We review only the order."

In Green v. Superior Oil Company, ......... Miss. ........., 59 So. 2d 100, the Court said: "This is essentially a companion case to Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85. It involves substantially the same issues as were raised in the Foote case, concerning the validity of an order of the State Oil and Gas Board requiring appellants to pool and integrate their interests in two gas drilling units in the Gwinville Field with all of the other owners in the units. We have studied carefully the record in the present case, and for purposes of the decision refer to and adopt the opinion in the Foote case referred to above. A few additional com-

ments concerning the present facts and points argued here are pertinent.

The court there disclaimed any purpose of deciding the issue now presented in the following words: "Appellants also state that Superior should have reasonably foreseen that spacing rules would at some time be adopted by the Board, when Superior obtained its leases in the late 1930's, and should have incorporated in its leases pooling clauses; that having failed to do this Superior cannot be relieved of its duties as lessee and of the terms of the leases by the compulsory pooling order of the Board; and that impossibility arising subsequent to the making of a contract does not excuse nonperformance of it as to events reasonably foreseeable. 17 C. J. S., Contracts, Section 463; 1 A. L. I., Restatement, Contracts, Sec. 288. Appellants rely upon Berline v. Waldschmidt, 1945, 159 Kan. 585, 156 P. 2d 865. However, this argument presupposes that under the statutes the Board's actions extended the primary terms of the leases, and we do not consider or express any opinion upon that point in this case. The Board's order directed the integration of appellants' interests whether they were unleased, or subject to leases. In the latter event, appellants' interest would consist in part of a possibility of reverter."

In Superior Oil Company v. Griffith, 214 Miss. 891, 59 So. 2d 104, on the authority of Hutchins v. Humble Oil & Refining Company, ........ Miss. ........., 59 So. 2d 103, and Superior Oil Company v. Foote, supra, the Court reversed the judgment of the circuit court and upheld the order of the Board and said: "but likewise without adjudicating the effect of such order upon the nature or extent of the rights of the respective owners."

In Hutchins v. Humble Oil & Refining Company, supra, it was said: "We are therefore without power in this proceeding to adjudicate the effect of the order upon

the property rights of appellants, regardless of its importance to them."

In Superior Oil Company v. Beery, supra, in construing the case of Superior Oil Company v. Foote, supra, the Court said: "In that case, the Court did not decide whether the establishment of the drilling units or the order of integration had the effect of extending or reinstating the primary terms of the leases. Neither do we decide that question in this case, but leave the same for consideration and decision, when and if such question may be properly before us."

Although this Court, in five decided cases, said that it was not deciding whether the establishment of drilling units or the orders of integration had the effect of extending or reinstating the primary terms of the leases, the majority opinion now says: "In other words, we think that the decision in the Green case (59 So. 2d 100) went a long way toward deciding the issue now before us."

But even assuming that, under the Green case, supra, the 1932 and 1936 Acts, by necessary implication, authorized the Board to establish drilling units, this is a far cry from the further step of compelling the holders of interests in such drilling units to pool their interests. In other words, although the Board, under such assumption, had the power to designate a certain 320 acres as a gas drilling unit, it still was without power to compel the drilling of a well, and was without power, until the enactment of Chapter 220, Laws of 1950, to require the affected parties to pool their interest. After the designation of the unit, the parties could take it or leave it alone.

While the Legislature, by the Acts of 1932 and 1936, granted to the Board, in my opinion, very limited powers, the effect of the majority opinion is to hold that such powers were, in fact, unlimited, and that the Board, under the guise of preventing waste and avoiding the

drilling of unnecessary wells, can do just about what-ever it desires.

I am unwilling to approve or justify the impairment and destruction of the rights of citizens, based and founded upon solemn written contracts, by invoking the police power of the State, unless and until the sovereign, through its Legislature, shall make that purpose clear and decisive. In the sincere and earnest belief that the wrong result has been reached in this case, I must, with the greatest deference, respectfully dissent.

### ON SUGGESTION OF ERROR

Apr. 27, 1953 29 Adv. S. 34 64 So. 2d 357

ROBERDS, J.

Appellee again argues that the 1932 and 1936 conservation statutes did not authorize the State Oil & Gas Board to promulgate rules and orders establishing drilling units, and that therefore there was accomplished no pooling of all the mineral interests in Unit No. 39. However, that question in substance had already been decided adversely to this contention in the following cases: Superior Oil Company v. Beery, 59 So. 2d 689 (Miss. 1952); Green v. Superior Oil Company, 59 So. 2d 100 (Miss. 1952); Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85, 844 (1952); Superior Oil Company v. Griffith, 214 Miss. 891, 59 So. 2d 104 (1952), suggestion of error sustained in part, 214 Miss. 900, 60 So. 2d 505; Hutchins v. Humble Oil & Refining Company, 59 So. 2d 103 (Miss. 1952); Superior Oil Company v. Morgan, 59 So. 2d 105 (Miss. 1952). To the same basic effect are Griffith v. Gulf Refining Company, 215 Miss. 15, 60 So. 2d 518 (Miss. 1952), Hassie Hunt Trust v. Proctor, 3 Adv. S. 5, 60 So. 2d 551 (Miss. 1952), and Humble Oil & Refining Company v. Welborn, 15 Adv. S. 1, 62 So. 2d 211 (Miss. 1953).

Appellee's contention that the Court has placed an unwarranted construction upon the habendum clause

in his lease ignores the fact that this provision must be read in the light of the statutes, the rules of the Board, and of the acts of the Board and lessees in creating the unit, and that this case is decided by those factors, and not by the terms of the lease. The present decision, holding that the effect of the establishment of the drilling unit is to pool all interests in the unit and thereby to extend the terms of all leases then in effect, is a logical and necessary step in the light of all of the foregoing cases, and is essential in giving practical effect to the establishment of the unit. In brief, production on the unit is the equivalent of production on appellee's land.

 Appellee suggests that we should take judicial notice of the fact that bills to amend the conservation statutes, in order to expressly confer the power of compulsory pooling on the Board, failed of passage in the 1940, 1942, 1944, and 1946 sessions of the Legislature, but this circumstance, if it exists, is not persuasive of legislative intent as to an already existing statute. Sears Roebuck & Company v. State Board of Optometry, 213 Miss. 710, 726, 57 So. 2d 726 (1952).

It is argued that the remedy of compulsory pooling is a judicial or quasi-judicial function, and for a compulsory order to be constitutionally valid, it must have been granted after notice and hearing to the parties affected by it; that no notice was given to appellee prior to the creation of the unit, and that therefore its creation is void as being violative of the due process clause.

Appellee concedes that in making regulations for spacing and for proration of production the Board acts in a legislative capacity, citing California Company v. State Oil & Gas Board, 200 Miss. 824, 27 So. 2d 542 (1947). And in that case the Court also held that in the granting of an exception to the spacing rules the Board was acting in a legislative and not a judicial capacity.

The first Beery case, 59 So. 2d 689, adopted and followed the decision in Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85, 94 (1952). It held that the

present Unit No. 39 had been established prior to the 1950 integration order based on the 1950 statute. The Foote opinion then held: "The only answer to that proposition which the appellees seriously argue is that Sec. 9 (b) requires a notice and hearing before the Board before the establishment of a drilling unit for each particular unit on the ground; and that no such notice and hearing was held for the establishment of Units 32 and 33. However, the joint operating agreement of August 4, 1948, designating Unit 33, and the designation of Unit 32 of May 18, 1948, were made at a time when appellees' and other owners' mineral interests were under admittedly effective leases owned by the parties to those instruments designating the units. Those lessees owned the exclusive right to drill for and produce gas. ▉▉▉ And in the drilling and spacing of wells, the lessee represents the royalty owners. 31-A, Texas Jur., Oil and Gas, Sec. 426, p. 746." This decision, applicable to the law and the rules in effect prior to the repeal of the 1932 and 1936 statutes, is res judicata on the question of notice and hearing.

In Griffith v. Gulf Refining Company, 215 Miss. 15, 60 So. 2d 518, 521 (Miss. 1952), it was there also held that where the unit was created without formal notice and hearing, under the laws prior to the 1948 Act, the lessee in the spacing and drilling of wells represented the royalty owners. A similar result was reached in Hassie Hunt Trust v. Proctor, 215 Miss. 84, 60 So. 2d 551 (Miss. 1952).

The foregoing principle established in these cases as to the creation of pooled units under the 1932 and 1936 statutes represents a practical and equitable result. The general rule is that in the drilling and spacing of wells the lessee represents the royalty owners. The Board was authorized to establish rules for spacing and for drilling units, which it did, after notice and hearing prior to the field-wide rules. There are two or more tracts within the unit, and once the unit is established no other well

could be drilled in it under the rules of the Board. The location of the well was fixed and approved. There was nothing left for the Board to pass upon in ordering integration of the unit. The responsibility for drilling the well and for paying the royalty owner his share of production is on the lessee alone. The royalty owner's only concern is that he obtain his pro rata portion of the production. Hence under the 1932 and 1936 laws notice and hearing to lessors prior to creation of a particular unit on the ground would serve no useful purpose, after the field-wide rules were made. Gulf Refining Company v. Griffith, 2 Adv. S. 27, 60 So. 2d 525, 526 (Miss. 1952).

Moreover, on this record there would have been no basis for the granting of an exception to the spacing rules, so as to allow the drilling of a well on the 50-acre tract in which appellee had a 15/50th interest subject to lease. An exception could be granted under the statutes and rules prior to the 1948 law only to prevent waste or to avoid confiscation of property. It was not necessary to prevent waste. The Board had already adjudicated that one well would efficiently drain 320 acres, and there is no showing to the contrary. As was held in the first Beery case, and in Superior v. Foote, 214 Miss. 857, 59 So. 2d 85, 95, the 1947 rules "for the Gwinville Field are premised on the finding by the Board that such rules are necessary to prevent waste."

The only other basis for an exception would be in order to prevent confiscation of appellee's property. The Board's rule for exceptions before the 1948 Act was similar to Rule 37 of the Texas Railroad Commission. The Supreme Court of Texas, in Gulf Land Company v. Atlantic Refining Company, 131 S. W. 2d 73, said "The term 'confiscation' evidently has reference to depriving the owner or lessee of a fair chance to recover the oil and gas in or under his land, or their equivalents in kind. It is evident that the word refers principally to drainage." The orders of August and September, 1947, re-

quired appellant and other lessees in the unit to pool all interests. This was done. As the result of this pooling, which was done at the command of the Board, appellant, appellee and others in the unit were able to recover the gas in or under their lands or its equivalent in kind. There was, therefore, no basis for an exception to the Board's rules, for neither appellant nor appellee could show that the Board's orders would result in confiscation. It is undisputed that there was substituted for appellee's right to have a well on his land the right to receive the same amount from the unit well as he would have been allowed to receive under the proration statutes. The allowable production from a well is apportioned according to the acreage content of the unit on which the well is drilled. In other words, there could not possibly exist any confiscation of appellee's property because he is receiving in Unit 39 exactly the same amount of gas as he would have been allowed to receive if he had obtained an exception.

Moreover, as the Court observed in the original opinion, the statutes dealing with exceptions to the drilling rules do not contemplate that the owner of an undivided mineral interest, here 15/50ths in a 50-acre tract subject to lease, would be entitled to have an exception granted and a well drilled on the tract for the benefit of his undivided interest only, where all of his co-tenants in the tract are participating in unit production and are not therefore eligible to join in a request for an exception. Appellee seeks in this suit in equity to participate in the production from the unit well located on lands other than his (which he could not do at common law), but he does not want to also assume the responsibilities and duties incurred by those within the unit. This inequitable position in a converse situation was condemned in the Griffith and Hassie Hunt cases.

Appellee next argues that the express repeal of the 1932 and 1936 statutes, by Chapter 256, Laws of 1948, destroyed any pooling of appellee's interest which may

have occurred by virtue of the earlier statutes and rules. The 1948 Act, approved by the Governor on April 9th, went into effect thirty days thereafter, on May 9, 1948. Prior to the effective date of the 1948 statute, Unit 39 had been created and established. Superior Oil Company v. Beery, 59 So. 2d 689 (Miss. 1952).

Section 21 of Chapter 256 repeals only the 1932 and 1936 statutes and not established drilling units. Nor is an implication of the latter type of result warranted by the enactment in Section 10 of a compulsory pooling statute for future use. Section 21 does not have the scope imputed to it by appellee. The statute repeals the 1932 and 1936 laws and "all other laws and parts of law in conflict herewith." It does not repeal completed actions of the Board prior thereto. It is a general repealing statute, and in effect operates as a declaration of what would be the legal effect of the act without that provision. It does not warrant an implication of a more extensive repeal. 50 Am. Jur., Statutes, Section 520. The same text in Section 526 says that ▉▉ the repeal of a statute does not affect rights which have accrued and vested under the repealed statute, and that construction is to be avoided which will give a retrospective operation to a repealing statute.

Unit No. 39 was created and established before the effective date of the 1948 Act. Section 21 has prospective operation only and is not retrospective. It was not designed to cancel accrued or vested rights and to have retrospective operation. Nor do its terms warrant such a reading as would raise that serious constitutional issue. And of equal significance, the suggested interpretation would result in the cancellation of every unit created and every act done by the Board prior to the 1948 Act. We do not think that this was the legislative intent.

▉▉ Appellee says finally that the pooling order of the Board of September 20, 1950, made under the 1950 statute, was held valid in Superior Oil Company v. Beery, 59 So. 2d 689, and that such order rendered res judicata

the matter of when Unit 39 was pooled; and that when the Board in September 1950 integrated Unit 39 under the 1950 statute, this was res judicata that there had been no integration prior to that date.

However, the original decision of this Court on appeal from the 1950 integration order expressly held that Unit 39 had been "legally established" prior to the order of September 1950. That case did not consider or adjudicate whether the effect of the establishment was to extend the lease. That question was expressly pretermitted, and that is the question here. Hence the integration order of September 20, 1950, and this Court's decision concerning it, in 59 So. 2d 689, is not res judicata of the issue decided here, since the present issue was not considered in the first Beery case. Moreover, the petition of Superior Oil Company in the first Beery case asked the Board for "the establishment or re-establishment, designation or re-designation, approval or re-approval of gas drilling Unit No. 39." The final order of the State Oil & Gas Board, dated September 20, 1950, which was there affirmed, adjudicated that the lands in question "have been heretofore duly and legally established as gas drilling and producing Unit No. 39"; and that the same was "reapproved". Hence appellee's argument that the order of 1950 adjudicated that prior thereto there had been no unit established has no factual basis in the record. The order itself, on the contrary, reflects an adjudication that the unit had previously been legally established as a gas drilling and producing unit.

Suggestion of error overruled.

*McGehee, C. J.,* and *Kyle, Holmes, Arrington* and *Ethridge* concur. *Hall, J.,* took no part.

---

LOTTERHOS, J., Dissenting.

It is my opinion that the suggestion of error should be sustained.

The gist of the holding of the Court in the original decision and in the majority opinion on the suggestion of error is that when Unit No. 39 was established under the authority of Chap. 117, Laws of 1932 and Chap. 305, Laws of 1936, it necessarily followed that there was a forced pooling of all mineral interests therein for production in and from said unit, and that, therefore, the lease on Beery's mineral interest was extended beyond the primary term, in spite of the refusal of Beery to agree to pooling, upon the theory that, because of said forced pooling of his interest, there was production under the lease from the land in which he owns an interest.

The fallacy in that holding lies in the fact that the establishment of a drilling unit is not the same thing as the creation of a pooling arrangement with respect to the several mineral interests. It appears clear that when a drilling unit is established, the particular acreage is set aside as the area upon which one well may be drilled by those having the right to drill under leases; and that the establishment of such unit does not in and of itself change the property rights of the interested parties nor force integration of mineral interests within the unit. The difference and distinction between the establishment of a drilling unit on the one hand and forced pooling of mineral interests on the other, is well illustrated by the provisions of Chap. 256, Laws of 1948. Of course, that statute does not apply in substance to the case at bar, because it was enacted after the pertinent events in this case had occurred. However, it is convincing upon the distinction between the terms referred to.

Sec. 4(g) of said Chap. 256 defines the word "owner" as "the person who has the right to drill into and produce from any pool, and to appropriate the production either for himself or for himself and another or others." In other words, the lessee is the owner. Sec. 6(c) grants to the board authority to make rules, regulations, and orders for several purposes, including "(11) To regulate the spacing of wells and to establish drilling units."

Sec. 9(a) authorizes the board to regulate the drilling and location of wells in any pool and the production therefrom so that "each owner" shall have the right to recover his fair share of the oil and gas in the pool. Sec. 9(b) directs the board to "establish a drilling unit or units for each pool," for the prevention of waste and to protect and enforce the correlative rights of "the owners" in the pool. The sections referred to up to this point concern the establishment of drilling units, and it will be noted that they concern and affect "the owners", that is, the lessees having the right to drill. This statute contemplates and provides for the creation of drilling units, in so far as the above mentioned sections apply, without regard to whether there is or shall be a pooling or integration of mineral interests.

We now come to Sec. 10(a) of this statute, which has to do with pooling. It is there provided that when separately owned tracts of land are embraced "within an established drilling unit", the "person owning the drilling rights therein" (the lessee), and the "rights to share in the production therefrom" (the royalty owners), may validly agree to integrate their interests and develop their lands as a drilling unit. It will be noted that, as a condition precedent to the right of the persons having the drilling rights and the persons having the right to share in production to validly agree to integrate their interests, there must be an established drilling unit. This is recognized in the decisions of this Court which have upheld forced pooling under said Chap. 256, Laws of 1948, as amended by Chap. 220, Laws of 1950. Said Sec. 10(a) of the 1948 statute further provides that if "such persons" have not agreed to integrate their interests the board may, as to a drilling unit of 40 acres in area or less, require "such persons" to integrate their interests and to develop their lands as a drilling unit. It is to be observed that Sec. 10(a), in dealing with integration of interests or pooling of interests, either by voluntary agreement or by directive of the board, deals with

and affects both the lessee, as the person owning the drilling rights, and the royalty or mineral owners, as those having the right to share in the production from the drilling unit. Sec. 10(c) of the act provides that if "the persons owning the drilling or other rights in separate tracts embraced within a drilling unit fail to agree upon the integration of the tracts and the drilling of a well on the unit," and it develops that the board is without authority to require integration, then "the owner" (that is, the lessee), of each tract embraced within the drilling unit may drill on his tract, but the allowable production from such tract shall be reduced in proportion to the acreage of such tract.

If, under the 1948 act, forced integration can be provided only upon a showing that precedently a drilling unit has been established, it then follows that the establishment of the drilling unit is something separate and distinct from the pooling and integration of mineral interests. This Court has held in The Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85, and in other cases cited in the original opinion and in the majority opinion on the suggestion of error, that under the 1932 and 1936 statutes the board had authority to establish drilling units and that it did establish drilling units. This proposition is now settled and, it appears, correctly, since these statutes authorized the board to regulate drilling, development, etc., in order to prevent waste and protect the common source of supply. However, in each of these cases concerning gas units in the Gwinville field, the Court expressly excluded from the decision any consideration and any action with respect to property rights as between lessors and lessees, or with respect to the extension of primary terms of leases. In other words, the Court declined at that time to determine whether those acts and transactions which served to establish drilling units under the statutes of 1932 and 1936, also served to enforce integration and pooling of mineral interests within such units. That question is squarely

presented to the Court in the case now under consideration and other pending cases.

The 1932 and 1936 statutes granted to the board general power only with respect to the regulation of drilling and development, without specifying details. This Court has held that in the exercise of that power the board established certain drilling units based on spacing regulations. In my opinion, those statutes of 1932 and 1936 did not empower the board to force integration and pooling of interests. Furthermore, the board did not consider that it possessed that power, nor did it attempt to exercise such power. The effect of the original opinion in the case at bar is to hold that those statutes of 1932 and 1936 empowered the board to force integration, and that the board did in fact force integration, even though it entered no order nor took any action which purported to exercise such power. That holding is, in my view, erroneous.

It is recognized that when Unit No. 39 was established, Superior was confronted with a difficult situation, in that only one well could be drilled on the 320 acres, and there was no pooling provision in its lease. It appears that Superior was in danger of not being able to extend its lease beyond the primary term, because the spacing regulations and the establishment of the unit prevented it from drilling a well upon the land included within its lease. That situation in which Superior found itself seems to have had great weight with the Court, as shown by the original opinion.

It is to be kept in mind that although the board had promulgated spacing regulations requiring drilling units of 320 acres, yet that the actual establishment of the drilling unit was the result of voluntary action of Superior and other interested lessees in taking appropriate steps to designate and establish the unit and obtain board approval thereof. When the unit was so established and when it appeared that only one well could be drilled upon the unit, it seems that Superior had several courses of

action open to it. It might obtain pooling agreements from its lessors and royalty owners. It attempted to do so but was unable to obtain such agreement from Beery. Another recourse was to apply to the board for an exception to the established unit. It appears that this effort was not made. The board's spacing order contained in the regulation of August 11, 1947, provided for exceptions, ''in order to prevent waste or to prevent the confiscation of property''; and that upon the granting of an exception the board would limit production or use other means to offset any advantage which the person securing the exception might have over other producers by reason of the drilling of the well as an exception, and so that the producer of the well drilled as an exception would be allowed to produce no more than his just and equitable share. For aught that appears, Superior might have obtained an exception in order to drill upon the tract in which Beery is interested, to prevent the confiscation of its property by loss of the right to extend the primary term of the lease by drilling.

The other course of action which was open to Superior was to proceed to pool or integrate its interest as lessee with similar interests of other parties, and proceed to develop the unit as established, receiving its proper portion of the production, whatever that might be. That was the course which Superior followed when it was unable to come to an agreement with Beery with respect to integration of his mineral interest.

Great weight has been given in the original opinion to the fact that Beery is and will be entitled to receive the same material benefits from royalties from the well drilled on the adjoining tract in the unit, as he would have received if a well had been drilled on the tract in which he owns a mineral interest. The argument based thereon is very persuasive, when this case is viewed upon a practical basis. However, it seems to me that Beery owned and owns a definite title to fifteen mineral acres, which was subject to a lease, expiring on a fixed day,

unless prior to that date there was production from a well drilled thereon. The property right, including the full mineral interest in said fifteen acres from and after the date of expiration of the primary term, could not be taken away from him and such taking justified upon the ground that the party taking his property was prepared to pay to him an amount of money equal to what he would have received if the lessee had drilled upon the land in which he was interested. In this connection, reference is made to the dissenting opinion of Justice Lee on the original decision of this case. (21 Adv. S. 88, 63 So. 2d 131).

There are other propositions involved in this case, but it is not deemed necessary to set forth my views thereon, since, in my opinion, the suggestion of error should be sustained for the reasons stated.

*Lee, J.,* joins in this dissent.

---

### ON MOTION TO RETAX COSTS

June 8, 1953 34 Adv. S. 180 65 So. 2d 455

ARRINGTON, J.

This motion is controlled by the decision in the case of The Superior Oil Company v. Alfred Foote, et al., No. 38562, this day decided.

Motion to retax costs of transcript on basis of 25¢ per 100 words sustained, on condition that the Chancery Clerk furnish a correct, amended statement of costs.

All Justices concur, except *Hall, J.,* who took no part.