FROST, et al. *v.* GULF OIL CORPORATION, et al.

No. 41457 April 18, 1960 119 So. 2d 759

776

*William A. Bacon,* Jackson; *I. M. Wilford,* Houston, Texas, for appellants.

*Wells, Thomas & Wells, C. C. Richmond,* Jackson; *James A. Boone,* New Orleans, La., for appellee Gulf Oil Corporation.

782

*Watkins & Eager,* Jackson, for appellees Sinclair Oil & Gas Company, et al.

GILLESPIE, J.

This is a suit to cancel an oil, gas and mineral lease owned by Gulf Oil Corporation, herein called Gulf, as to the undivided one-half mineral interests of complainants, herein called the Frost Group, in 115 acres of land in the Gwinville Field in Jefferson Davis County. From an adverse decree, the Frost Group appeals.

The tract of land involved is the 115 acres owned by one Gholar, who, on June 29, 1937, executed an oil, gas and mineral lease to Gulf for a primary term of 10 years and ". . . as long thereafter as either oil, gas, sulphur or other mineral is produced in paying quantities." The lease contained no pooling provision. On October 4, 1937, the Frost Group acquired an undivided one-half interest in the minerals in the Gholar lands subject to the lease to Gulf but including one-half of the benefits accruing to the lessors thereunder.

On May 24, 1945, Gulf completed an oil well on the Gholar lands. The well was drilled to a depth of 9400 feet and casing was set to that depth. Electric logs and drill-stem tests indicated numerous productive intervals. Production was from performations between 8570-78 feet below surface. We shall refer to this well as the Gholar Oil Well.

On October 11, 1945, Gulf completed a gas well known as the A. L. Norwood No. 1 on lands lying a short distance east of the Gholar tract. The Frost Group declined to sign a pooling agreement proposed by Gulf for a producing unit for the A. L. Norwood No. 1, a gas well producing from an interval less than 8300 feet below

surface. The pooling agreement finally signed by Gulf and the Frost Group was limited to a depth of 8300 feet below surface, and it expressly provided that production on the Gholar lands below 8300 feet would be in accordance with the Gholar lease. We assume without discussion that under the terms of the pooling agreement signed by the Frost Group for the purposes of integrating their mineral interests in the Gholar lands for the A. L. Norwood No. 1 Unit for production of gas, such production from that well would not extend beyond the primary term the lease as to the Frost Group's interest in the minerals below 8300 feet in the Gholar lands. The Frost Group have been paid all the royalties due from production from the A. L. Norwood No. 1, which well is still producing gas.

The Gholar Oil Well began making excessive amounts of salt water in the early part of 1955, and the production of oil had declined to 9 barrels a day. Salt water production was 600 to 700 barrels a day. The gas pressure (it was a high ratio oil well) had slightly increased. The production of salt water created disposal problems. After study of the well and its behavior by geologists, petroleum engineers, and management, it was decided by Gulf that the Gholar Oil Well should be reworked for the purpose of squeezing off the salt water and reperforating the upper part of the same Gholar oil sand. On Gulf's application a permit for the stated purposes was issued by the Mississippi State Oil and Gas Board, herein called Board. Pursuant to this permit, Gulf "killed" or shut in the Gholar Oil Well on May 24, 1955. The primary term of the Gholar lease had long since expired. The squeeze job was a failure and the well produced only salt water from perforations in the upper part of the Gholar Oils and after the lower part had been squeezed off. The Gholar oil sand was depleted.

Gulf then perforated the interval 8582-8590 feet and gas was produced therefrom in paying quantities from a new sand that became known as the Gholar gas sand

and which was not connected with any gas or oil sand then producing in the field. The well was recompleted as a gas well from the interval stated on June 13, 1955, and was allowed to produce and flow into pipe for fifteen days, or until June 29, 1955, when the well was shut in pending action of the Board, as later herein stated, and after order of the Board dated October 19, 1955, the well was put on production October 24, 1955.

The Frost Group contend that when the Gholar oil sand was depleted and there was no further production from that sand interval, the lease terminated, and that Gulf as lessee did not have the right thereafter to perforate another interval and "discover" a new producing interval. They contend that after a producing sand is depleted after the exploration of the primary term, the lessee has no additional period for exploration. Stated in its proper perspective, the first question is: When a well is drilled to a certain depth and electric logs and drill-stem tests indicate several productive sands or intervals, and casing is set and one of the sands produces past the date of expiration of the primary term of the lease and the sand becomes depleted, does the lease then expire, or does the lessee have a reasonable time to bring in production from another sand or interval within the limits of the original depth?

██ █ The lessee's estate is a determinable fee in the minerals. Koenig v. Calcote, 199 Miss. 435, 25 So. 2d 763. ██ █ Mineral leases are construed against the lessee and in favor of the lessor. Summers Oil & Gas, Perm. Ed., Vol. 2, Sec. 372. ██ █ The same authority recognizes that the rules for construction of a mineral lease are generally the same as those employed to interpret other written instruments.

██ █ The authorities agree that temporary cessation of production after the expiration of the primary term does not terminate the lease, ipso facto. ██ █ A reading of the numerous cases cited by the parties clearly indicate that the courts have generally applied the rule

of reasonable construction to the question of when and under what circumstances cessation of production after the expiration of the primary term will terminate a mineral lease. Consideration must be given to the contract itself and the circumstances attending the cessation and whether the cessation is a reasonable incident to the continued production of minerals. In Cortner v. Warren (Okla.), 330 P. 2d 217, it was said: "... We conclude that the rule quoted above from the Lamb v. Vansyckle case is the soundest and most equitable and the same is adopted. Under that rule, the controlling factual finding is whether or not the temporary stoppage in production was for an unreasonable length of time. In the case now being considered, the cessation was for a period of from five to six months." In Lamb v. Vansyckle, 205 Ky. 597, 266 S.W. 253, referred to in *Cortner,* the Court said that "... we have reached the conclusion that the only fair and just rule is to hold that the lease continues in force unless the period of cessation, viewed in the light of all the circumstances, is for an unreasonable time." Cf. Midwest Oil Corp. v. Winsauer, 323 S.W. 2d 944 (Tex. 1959); Reynolds v. McNeil, 218 Ark. 453, 236 S.W. 2d 723; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336; South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S.E. 961; Cole v. Philadelphia Co., 345 Pa. 315, 26 A.2d 920.

██ ■ The lease in question does not say that it shall be in force so long as minerals are continuously produced. It is clear that the parties did not intend that continuous production should be of the essence of the contract. Cessation of production is necessary for various reasons and as already indicated the Courts have generally recognized that cessation of production for necessary purposes and for a reasonable length of time will not terminate the lease. We think that it was within the contemplation of the parties to the lease that after the lessee has spent large sums of money in drilling a well that the lessee would have the opportunity to pro-

duce all of the intervals indicated by electric logs, drill-stem tests, and other tests, as productive intervals, and that a cessation of production upon the depletion of one or more intervals in order to produce other intervals does not terminate the lease where there is no unreasonable delay in proceeding to test and bring in another producing interval.

The Frost Group next contend that the lease to the deep rights below 8300 feet terminated because of the interruption of production of gas from the Gholar gas well from the interval 8582-90 feet for the period from June 29, 1955 to October 24, 1955.

When the Gholar gas sand was brought in on or about June 13, 1955, the well was produced for fifteen days, after which it was shut in to await the orders of the Board. This was a new sand and had not theretofore been produced from any well. Another company had drilling rights in the area and Gulf promptly began negotiations with this other company and compiling data looking toward the definition of the pool. Many meetings were had and considerable study was made with reasonable dispatch by geologists, petroleum engineers, attorneys, and management.

Statewide rules of the Board provide, in substance, that if any well is completed as a gas well, it shall not be produced except for a test period of not exceeding fifteen days or until authorization has been granted by the Board after notice and hearing. The Special Field Rules for the Gwinville Field had provisions substantially the same as the statewide rules. On September 15, Gulf wrote Mr. C. M. Frost, who appears to be the leading member of the Frost Group, advising him of the reworking and the recompletion of the Gholar Well as a gas well, and the necessity of complying with the rules and regulations of the Board so as to place the well in production. On September 19, 1955, Gulf and Humble Oil & Refining Company, owners of the leases in the lands overlying the Gholar gas pool, filed a petition with the

Board in which it was stated, among other things, that the Gholar gas pool was a separate pool, its depth and the approximate area covered by this gas pool, and that it was encompassed within five established drilling units then presently producing from another pool (less than 8300 feet below surface).

The land in each of the five units was described, one of said units being the Gulf Refining Company A. L. Norwood Gas Unit No. 1, already referred to, containing 316 acres and which included the Gholar tract. All the other units save one contained 320 acres. The petitioners prayed that the five drilling units should now be established, confirmed, and approved as drilling and producing units from the Gholar gas pool as exception units. The petition stated that each drilling unit had therefore been integrated either by voluntary agreement or forced integration by the Board (they had been so integrated as to the production from the gas pool less than 8300 feet below surface). It was alleged that the establishment, confirmation, and approval of said units would prevent the drilling of unnecessary wells and would enable the production of all recoverable hydrocarbons from said Gholar gas pool without avoidable waste in time and material, and would enable the production of gas from the said Gholar gas pool in a manner consistent with sound operating practices and in a manner that would prevent all avoidable waste. It was further alleged that the allocation of gas to and among the respective units and authorized to be produced should be on the basis and in the proportion that the productive acreage in said pool contained in each drilling unit bears to the productive acreage contained in said pool in all five drilling units, which basis of allocation would fully and adequately protect the correlative rights of all interested owners in the production from said pool.

Said petition alleged that the Gholar No. 1 Well, originally completed and produced as an oil well in 1955,

was reworked and recompleted as a gas well in the Gholar gas pool, and that said well would efficiently drain all the hydrocarbons in the Gholar gas pool beneath said drilling unit, and all correlative rights of all owners will be fully and adequately protected by establishing said unit.

The petitioners prayed for legal and public notice, for hearing at the regular October 1955 meeting of the Board, and for an order amending the existing field rules in the Gwinville Field in order to make said rules fully applicable to said Gholar gas pool; and the petitioners prayed that the five existing established gas units already referred to be established, approved and confirmed by the Board as gas drilling and producing units in the said Gohlar gas pool as exception units therein; and they prayed for other relief in the premises. Thereafter due and proper notice was given by the Board as required by law.

Pursuant to said petition and notice, the Board, on October 19, 1955, entered an order establishing special field rules and regulations for the Gholar gas pool, defining the Gholar gas pool as to the depths of the sands and allocation of production from the wells therein, and providing that allowables should be set by the Board each month. The Board found that the entire acreage underlain by the Gholar gas pool is encompassed within the five established drilling units which were then producing, and described the five units. The five drilling units were then established, confirmed, and approved as drilling and producing units for the Gholar gas pool and an allowable for the production of gas from the Gholar gas pool should be allocated to and among the five drilling units on the basis of and in the proportion that the productive acreage in said pool contained in each drilling unit bears to the productive acreage contained in said pool in all five drilling units. The Board found the A. L. Norwood gas unit, encompassing the Gholar lands, contained 116.6 productive acres, and

the other four units contained 91.5, 67.8, 71.8 and 145.5 acres, respectively, the entire Gholar gas pool containing 493.2 productive acres. The Board then found that the Gholar gas well producing from said A. L. Norwood Unit No. 1 would effectively and efficiently drain all the hydrocarbons in the Gholar gas pool beneath said drilling unit, and would prevent the drilling of an unnecessary well on said unit, and would protect the coequal and correlative rights of the owners in said unit and in said pool and field. Similar adjudications were made for the other four units. An appropriate plat was filed with the Board. Allowables were made by the Board monthly after October, 1955.

We are of the opinion that the aforesaid proceedings before the Board were conducted without unnecessary delay and were necessary in order to comply with the said rules of the Board, and such cessation of production pending these administrative procedures was an incident to the proper production of gas from the Gholar gas pool, and was therefore not an unreasonable delay under the authorities already mentioned.

The Frost Group relies principally on Haby v. Stanolind Oil & Gas Company, 228 F. 2d 298 (C.C.A., 5th, construing a Texas lease). While Haby has been criticized by good authority, we think it is distinguishable because of the particular terms of the lease there involved. Moreover, the Court held that the well was not produced during the nine months' cessation because it was economically inadvisable rather than impossible to produce. In this State, leases are construed subject to the applicable statutes for the conservation of oil and gas and the orders, rules and regulations of the Board promulgated pursuant to the statutes. Superior Oil Co. v. Beery, 216 Miss. 664, 63 So. 2d 115.

The Frost Group contends that Gulf did not have to shut down the Gholar gas well because it was a discovery well and not subject to the field and statewide rules of the Board because of the provisions of

Section 6132-10(c) (12), Mississippi Code of 1942, which provides that owners and producers of each discovery well in a new field or pool shall certify to the Oil and Gas Board an itemized list of the expenses incurred in the actual drilling of such well, and that the discovery well shall not be liable to the restrictions of this Act until the cost of drilling such well shall have been recovered in oil or gas from said discovery well. The statute just referred to is not applicable to a situation where an oil well, the drilling of which has been paid for from oil production, is recompleted as a gas well. That is the situation here involved and we do not think the statute applies but that the special field rules and the statewide rules do apply. Gulf properly closed the well on June 29, 1955, until the order of October 19, 1955 was entered by the Board.

■■ ■ The Frost Group's next contention is that it should have judgment for one-half of the entire production from the Gholar Gas Well since June 13, 1955. This contention is based on the assumption that the lease as to rights below 8300 feet terminated, and because, they contend, there was no voluntary or forced integration of their rights. We have already determined that the lease did not terminate because of the temporary cessation of production for the two periods in 1955. It now remains to be determined if the deep rights of the Frost Group were integrated into the gas unit. Pursuant to the petition of Gulf and Humble filed September 19, 1955, and after due notice to all parties, the Board entered its order October 19, 1955 establishing the five gas units as exception units for production of gas from the Gholar gas pool and provided for allowables. These proceedings have already been described. It found that production from said units, including the unit encompassing the Gholar lands, would fully and adequately protect the correlative rights of all interested owners in the production from said pool. The said order adjudicated all things necessary for the establishment of

said units for gas production. This was all that was necessary to constitute the pooling and integration of the Frost Group's deep rights. Superior Oil Company v. Magee, 227 Miss. 868, 87 So. 2d 280, and cases cited therein. The Frost Group made no appearance before the Board at the hearing resulting in the order of October 19, 1955. They cannot now make a collateral attack on that order.

 Finally, the Frost Group contend that the lower court erred in fixing their royalty interest at one-half of ⅛ of 115/316ths. They contend that the proof showed that 109 of the 116.6 productive acres in the 316 acre gas unit underlaid the boundaries of the Gholar tract. In other words, approximately 109 of the 115 acres contained in the Gholar lands are underlain by productive sand as the pool was defined, and that most of the balance of the 316 acres in the unit are unproductive. They contend that their royalty should be ½ of ⅛ of 109/115ths of the production allocated to the unit. This contention is a collateral attack on the order of the Board dated October 19, 1955, which order was entered, as already stated, after due notice and from which no appeal was taken. Even where the landowner made a direct attack by appeal contending that the Board made improper intra-unit distribution of the allowable because done on a surface acreage basis, this Court, in Humble Oil & Refining Co. v. Welborn, 216 Miss. 180, 62 So. 2d 211, held that the legislature "... has fixed surface acreage as the basis for apportionment of production in each unit."

 The lower court fixed the royalty due the Frost Group at ½ of ⅛ of 115/316ths, the amount Gulf offered to pay and the Frost Group refused to accept. The lower court was correct.

We hold that the learned chancellor correctly decided the case and his decree is affirmed.

Affirmed.

*McGehee, C.J.,* and *Kyle, Holmes* and *Ethridge, JJ.,* concur.