257 So.2d 496 (1971)
LONE STAR PRODUCING COMPANY et al.
v.
Guy M. WALKER.
No. 46409.
Supreme Court of Mississippi.
December 6, 1971.
Rehearing Denied January 10, 1972.
*497 Gibbes, Graves, Mullins & Bullock, Laurel, Heidelberg, Woodliff & Franks, Luther M. Thompson, Jackson, for appellants.
Walker & Sullivan, Lowell W. Tew, Laurel, for appellee.
SUGG, Justice.
This is an appeal from a decree of the Chancery Court of the Second Judicial District of Jones County, Mississippi cancelling two oil, gas and mineral leases of the appellants as a cloud on the title of the appellee, Guy M. Walker, and awarding appellee damages in the amount of $19,150.00.
The oil, gas and mineral leases of appellants were executed on January 14, 1957 and April 4, 1957 for a primary term of ten years and the top leases of appellee on the same property were executed on February 5th and 10th, 1969. All reports were filed by Lone Star Producing Company who was the operator of the leases for appellants.
The D.M. Thatch lease of appellants contains the following clause:
If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith... .
The Blanche Thatch Odom lease of appellants contains the following clause:
If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith... .
The questions first presented for decision in this case are: Did the leases expire after the primary term because oil, gas or other minerals were not being produced on the land covered by the leases and did appellants engage in drilling or reworking operations with no cessation of more than sixty (60) consecutive days? A proper consideration of the questions requires a brief summary of the evidence presented to the trial court.
The B.T. Odom well was drilled under appellants' leases on the subject property *498 and dually completed in 1961 in the Rodessa "C" and Sligo intervals, the producing mechanism of the Sligo interval being a water drive and the producing mechanism of the Rodessa "C" interval being a solution gas drive. Production from the Sligo interval produced a considerable quantity of water along with the oil and production from Rodessa "C" produced no water.
The Odom well produced from both intervals until January, 1964 when production from the Rodessa "C" was terminated. The last three months of production in the Rodessa "C" interval was 401 barrels of oil in January, 1964, 1,000 barrels of oil in December, 1963 and 1120 barrels of oil in November, 1963.
Appellants contend that in 1967 the Sligo interval began to show signs of watering out and as a result a geological and engineering study was proposed on the Odom well and surrounding wells. The record shows that the Humble-Bryan Oil Unit #4, a west offset to the Odom well was producing in the Rodessa "C" interval at the rate of approximately 60 barrels of oil per day with no water, and that the J.M. Thatch #1 well, a northwest offset to the Odom well, had been recompleted in the Rodessa "C" interval and produced 1352 barrels of oil in April, 1968 with no water. The last production in the R.L. Thatch well, a direct north offset to the Odom well, was 130 barrels of oil in May, 1966. No production was shown in the Rodessa "C" interval, in direct offsets east and south of the Odom well.
The last production from the Odom well was on August 17, 1968 but appellants contend that they were engaged in a continuous reworking operation in an effort to secure production from the Odom well from May, 1968 until it was completed as a producer in the 1st Rodessa interval, an interval between Rodessa "C" and Sligo, on January 27, 1969, and that such efforts constituted a reworking operation as contemplated by their leases that would prevent termination of the leases.
When production from the Rodessa "C" in the Odom well declined a decision was made by appellants to shut-in the Rodessa "C" completion and produce only from the Sligo interval. Appellants isolated the Rodessa "C" interval with a packer and resumed production from the Sligo interval. In May, 1968 appellants ran a Neutron Lifetime Log, (a radioactive log which can be run in a hole in which casing has already been set as contrasted to a normal electric log which must be run in an open hole,) and on the basis of information obtained from the Neutron Lifetime Log determined that the Rodessa "C" and the first Rodessa were capable of potential production of hydrocarbons. After the running and evaluation of the Neutron Lifetime Log a work over rig was moved in, the Sligo interval was abandoned and the well was singly completed in the Rodessa "C" interval. Seventeen feet of perforations were added to include the area shown by the Neutron Lifetime Log to have a high oil saturation. Appellants state that the top perforations in the Rodessa sand were not squeezed off at that time because they thought the water shown on top of the Rodessa "C" by the Neutron Lifetime Log was work over fluid which had entered the Rodessa "C" and could be removed by pumping in a few days. The packer that had been placed between the Rodessa "C" and Sligo approximately four years before was replaced by a bridge plug in the belief that high pressure water had come up the casing and invaded the Rodessa "C" and moved the oil away from the well bore. Appellants stated that, after pumping did not remove the water from the Rodessa "C" interval, it was believed that the water, instead of coming up through the casing, was entering the Rodessa "C" between the production casing and the hole wall. To stop this flow of water a work over rig was moved on location in October, 1968 to cement the existing perforations in the Rodessa "C" and to reperforate in the Rodessa "C". In January, 1969 a work over rig was again brought on location and the well was completed in the 1st Rodessa interval which was encountered and logged *499 when the well was initially drilled and which, according to the Neutron Lifetime Log, remained productive.
Appellee offered evidence to the effect that the Rodessa "C" formation ceased production in January, 1964 because the zone was depleted and that if the Odom well was making salt water in the Rodessa "C" a reasonable and prudent operator would have squeezed the existing perforations from 10,238 feet to 10,250 feet to shut off the invaded water; that the reworking operation of appellants in May, 1968 was that of a reasonable and prudent operator; that the Neutron Lifetime Log showed a tight sand in the top of the Rodessa "C" rather than showing water on top of the Rodessa "C" and in view of the fact that the reports filed by the appellants with the State Oil and Gas Board show that no salt water was produced in the months of June, July, August and September, 1968 from the Rodessa "C", the well test reports of appellants were in error.
On voluminous and conflicting testimony the chancellor held as a fact that there was no commencement of drilling or reworking operations within sixty (60) days after cessation of actual production for the periods August 17, 1968 to October 20, 1968 and also from November 7, 1968 to January 20, 1969.
The well status report for 1968 on the Odom well shows the following:

 Sligo Interval Rodessa "C" Interval
Month Oil Water Oil Water 
January 103 3330 0 0
February 65 864 0 0
March 128 1152 0 0
April 101 1582 0 0
May 67 1608 0 0
June 0 2325 27 0
July 0 1581 95 0
August 0 1891 61 0
September 0 1890 0 0
October 0 0 69 0
November 0 0 0 0
December 0 0 36 0

The chancellor was justified in finding that there was no oil production after August 17, 1968 and in finding that appellants had not engaged in a continuous reworking operation.
The appellants claimed, by production reports filed with the State Oil and Gas Board, production of 69.3 barrels of oil in October, 1968, 36.3 barrels of oil in December, 1968 and 14.87 barrels of oil in January, 1969 from the Odom well, and it is apparent from the record that this oil was not produced in the Odom well but was moved by the appellants from a skimmer tank and reported as production in an obvious effort to show production within a sixty (60) day period to keep their leases from terminating by their own terms.
In addition to this false claim made by the appellants they also claim production from the Rodessa "C" interval for the months of June, July and August, 1968 and claimed that they were pumping an undetermined amount of salt water daily from the Odom well from the Rodessa "C" interval. The well status report shows that salt water was pumped from the Sligo interval during the months of June, July, August and September, 1968 and although appellants claim that salt water was being pumped from the Rodessa "C" interval, the well status report for these months reveals that no water was pumped from the Rodessa "C" interval.
It is obvious from the record that appellants have filed false reports with the State Oil and Gas Board in an effort to sustain their contention that there was either a continuous reworking operation or that oil was produced within sixty (60) day intervals to prevent a termination of their leases and this falsification of the records militates most strongly against the appellants.
Rule 25 of the Statewide Rules and Regulations of the State Oil and Gas Board provides:
After a well has once been completed, it shall not be deepened or plugged back, except for ordinary maintenance operations, without first giving five (5) days written notice to the Supervisor of the *500 character of the work proposed and the time when it will begin, except in an emergency as set out in these rules. The application shall be given on Form No. 2 prepared by the Board. The Supervisor shall notify in writing the applicant whether the contemplated work is approved or disapproved. In the case of an emergency, the application may be made orally or by telegraph, and the Supervisor may orally or by telegraph authorize the work; however, written application must be filed even though the work has already been commenced or completed and a written permit shall be issued which shall contain the emergency authorization.
No effort was made by appellants to comply with the requirements of Rule 25 until applications for permits to rework were filed on June 4, 1969, long after the reworking operations had been performed. It is noted that Rule 25 requires five days written notice to the supervisor of the intention to deepen or plug back a well. There was an absolute failure on the part of appellants to comply with this requirement.
Oil and gas operators should file accurate reports with the State Oil and Gas Board so that the information contained in the reports required by the regulations of the Board can be evaluated by members of the Board, other operators, landowners, lessors and mineral and royalty owners and other interested persons. If false reports are filed the data contained in these reports would be meaningless. The operator of an oil well has within his exclusive knowledge the information pertaining to such well and it should be fairly and accurately reported to the Board.
We are of the opinion that the chancellor correctly found on the issue of fact and affirm his finding that more than sixty (60) days elapsed at two different periods when there was no production, no drilling and no reworking operations.
We affirm the finding of the chancellor where he stated:
The fact that the defendants made a producing oil well after January 27, 1969, on said property is not relevant to the termination of the lease since the leases had already terminated according to the conditions of the lease itself and no acts of the defendant, short of securing a new lease or written ratification of the old lease, could serve to revive a lease already expired by virtue of its own terms. No such new leases or ratification were obtained.
Appellant urges that the chancellor should be reversed because he found that in order to constitute reworking operations it was necessary for a work over rig to be located on the well site. We do not understand the chancellor's finding to have been such, and hold that it is not absolutely necessary that a work over rig be on the well site as a necessary incident to a reworking operation.
It would be difficult, if not impossible, to formulate a rule that would with exactness define reworking operations such as those contemplated by the terms of the leases in question because the problems of capturing and producing oil and gas located thousands of feet below the surface of the earth are many and varied. Reworking operations may encompass testing, evaluation and other acts performed necessary to reworking a given well, and each case will have to be considered in the light of facts peculiar to that operation. One of the prime requirements is that the acts of the operator constitute a bona fide effort to rework a given well.
Appellants argue that it is unreasonable to ask this Court to believe that they would spend approximately $45,000.00 on a bad faith operation in attempting to restore production in the Odom well when new leases could have been obtained for $9,674.99, the amount paid by the appellee, Walker. The record does not show that appellants tried to acquire additional leases from the landowners and since appellants abandoned production in the Rodessa "C" interval in the Odom well in January, 1964 and made *501 no effort to produce from this interval until May, 1968, it is within the realm of probability that since they apparently permitted drainage in this interval a lease could not be obtained from the landowners.[1]
Appellants strongly urge that the rule announced in Frost v. Gulf Oil Corporation, 238 Miss. 775, 119 So.2d 759 (1960), should be applied to this case.
The Frost case had under consideration a lease which did not contain the sixty (60) day clause which is in appellants' leases and held that temporary cessation of production after expiration of the primary term of a mineral lease does not terminate the lease, ipso facto. The case announced the rule that where a well was drilled at great expense and electric logs and drill stem tests indicated several productive sands or intervals, and upon depletion of one of the sands that produced past the date of expiration of the primary term of the lease, lessee had a reasonable time to bring in production from other sands or intervals within the limits of the original depth, and that cessation of production in order to produce other sands or intervals would not terminate the lease.
Appellants' leases contained provisions that if production ceased for sixty (60) days and drilling or reworking operations were not conducted without cessation for more than sixty (60) days, the leases would terminate; therefore, the rule in Frost has no application to this case.
The testimony amply supports the finding of the chancellor that production ceased for more than sixty (60) days and appellants did not prosecute drilling or reworking operations with no cessation of more than sixty (60) days.
The other contention urged by appellants is that the chancellor erred in allowing damages in the amount of $19,150.00.
The Odom well produced from the 1st Rodessa after completion of reworking operations by the appellants in January, 1969 and continued to produce to the time of the trial.
The chancellor, in his opinion, found damages in the amount of the value of production less reasonable costs of production and in this we find no error. For the reasons stated the case is affirmed.
Affirmed.
GILLESPIE, C.J., and JONES, BRADY and SMITH, JJ., concur.
NOTES
[1] Appellants made a study in 1968 of the recoverable reserves from the Rodessa "C" in the Odom well and determined by a conservative estimate that approximately 40,000 barrels of oil could be recovered. The northwest offset to the Odom well, the J.M. Thatch well, has produced in excess of 100,000 barrels of oil since recompletion in the Rodessa "C", and the Bryan-Humble #4, a direct offset is producing from the Rodessa "C".