862 So.2d 1021 (2003)
Ben G. O'NEAL and Sally Adrienne O'Neal Webb, Plaintiffs-Appellants
v.
JLH ENTERPRISES, INC., Ida Oil Corporation, and Dzurik Interests, Inc., Defendants-Appellees.
No. 37,432-CA.
Court of Appeal of Louisiana, Second Circuit.
December 1, 2003.
Rehearing Denied January 22, 2004.
Klotz, Simmons & Brainard by David Klotz, Shreveport, for Appellants.
*1022 Herman Lawson, Mansfield, for Appellee JLH Enterprises, Inc.
G. Warren Thornell, Shreveport, Plummer & Means, L.L.C., by David B. Means, Mansfield, Bo Roseberry, for Appellees Dzurik Interests, Inc. and Ida Oil Corporation.
Before WILLIAMS, PEATROSS and DREW, JJ.
DREW, J.
Ben O'Neal and Sally O'Neal Webb (collectively referred to as "plaintiffs" or "O'Neals") appeal a judgment denying both their claim that an oil and gas lease granted by them had expired due to lack of production, and their claim that they are entitled to damages of double the amount of past-due royalties as well as attorney fees.
We affirm.

FACTS
The O'Neals are the owners of the mineral rights underlying approximately 599 acres in DeSoto Parish described as:
The Northeast Quarter of the Southwest Quarter and the South Half of the Southwest Quarter, less one (1) acre to Gallie Church, Section 14; the Northeast Quarter, the East Half of the Northwest Quarter, the Northeast Quarter of the Southwest Quarter and the North Half of the Southeast Quarter, Section 23; the West Half of the Northwest Quarter and the Southeast Quarter of the Northwest Quarter, all in Section 24, Township 12 North, Range 15 West, DeSoto Parish, Louisiana, comprising 599 acres, more or less.
On April 8, 1985, the plaintiffs entered into a mineral lease on the above-described property with JLH Enterprises, Inc., for which the O'Neals were to receive a 1/5th royalty. Attached to the lease was Exhibit A, which set forth the primary term of the lease. Exhibit A provided, in part:
The term of this lease shall be for a period of ninety (90) days from the date that the lessee obtains approval from the Department of Natural Resources, Office of Conservation, State of Louisiana, at a legal location on the property contained in the aforementioned oil, gas, and mineral lease....
Lessee agrees to drill the initial test well within a period of ninety (90) days to a depth of 4000 ft., or a depth sufficient to test the Mooringsport Formation, whichever is a lesser depth. Lessee further agrees to drill one well every 180 days from the completion of the previous well drilled. If the drilling obligation of this lease is not fulfilled, and one well is not drilled every 180 days from the completion of the last well drilled, this lease shall be terminated and only that portion of this lease included in a unit approved by the Department of Natural Resources, Office of Conservation, will remain in full force. In the absence of units each producing oil well will hold only forty (40) acres in the form of a square as nearly as possible, and each gas well will hold only one hundred sixty (160) acres in the form of a square as nearly as possible.

* * *
In 1987, the lease was amended to correct its property description and ratified because the entire lease was in producing units.
On June 2, 1987, the Louisiana Office of Conservation created eight drilling and production units in the Glen Rose Sand, Reservoir C, Canadian Bayou Field ("GR RC") in DeSoto Parish. The GR RC was defined as the gas and condensate bearing sand encountered between the depths of *1023 3,140 feet and 4,100 feet in the JLH Enterprises-O'Neal No. 1 well.
Three wells were completed on the leasehold, namely O'Neal No. 1, O'Neal No. 2, and O'Neal No. 3. In addition, parts of the leasehold were included in a unit for gas production from the McCoy No. 1 well. Each of the three O'Neal wells was apparently included in separate units producing gas from the Glen Rose Formation. The O'Neal No. 2 well ("OW-2") was in a 320-acre unit, 240 acres of which were on the property covered by the O'Neal lease, and the remainder on property owned by Carlton McCoy. JLH Enterprises received a permit to drill the OW-2 in February of 1986.
At some point, JLH assigned its working interest to Ida Oil Corporation. Sundance Energy Corporation operated the O'Neal lease from May 1, 1992, until May 1, 1999, when Sundance transferred the operating rights to Pace Royalty Fund, Inc. During the time Sundance operated the lease, the only producing well was the OW-2, which was the unit well for GR SC Sand Unit E. Sundance unsuccessfully attempted to reestablish production from the O'Neal Well No. 1. The O'Neal Well No. 3 was plugged and abandoned in 1996 or 1997, but the O'Neal No. 1 was not plugged and abandoned.[1] Sundance never operated the McCoy well.
In March of 1999, O'Neal sent an undated letter to Sundance in which he noted that the royalty check for November, 1998 was not received until March of 1999 despite repeated telephone demands for payment. O'Neal demanded that Sundance release the lease, abandon the wells, remove pipelines, and clean up the site. William Roseberry, President of Sundance, did not recall receiving this letter, although he signed a certified mail receipt on March 25, 1999.
On June 22, 1999, Roseberry mailed royalty payments for the OW-2 for the months of January, 1999 through April, 1999 to O'Neal. He requested that O'Neal hold the checks for March and April until July 1 before depositing. Roseberry also apologized for the late royalty payments, and added that Pace had assumed operations effective May 1, 1999. Roseberry blamed the late payments on his health problems.
The record reflects that in July 1999, Pace paid $1,089 in royalties to each of the O'Neals for May 1999 production from the OW-2. Apparently, this was the only royalty payment made by Pace to the O'Neals. O'Neal cashed his check from Pace, but his sister did not cash her check.
On February 4, 2000, O'Neal wrote a letter to the District Manager of the Office of Conservation requesting that the OW-2 be sealed due to Pace's failure to file production reports.
On March 16, 2000, O'Neal executed an affidavit regarding cancellation of the lease. He stated that the OW-2 had not produced since May of 1999, and that no production reports concerning the lease had been filed with the Office of Conservation since June 1, 1999. He concluded that the lease had expired by its own terms. This affidavit was filed in the conveyance records of DeSoto Parish on March 21, 2000, and received by the Office of Conservation on May 8, 2000.
Also on March 16, 2000, the O'Neals executed a mineral lease on the leased property with C.H.C. Gerard. This top *1024 lease was recorded in DeSoto Parish on March 26, 2001.
On March 1, 2001, Ida Corporation assigned its right and interest in the lease to Dzurik Interests, Inc., which took over operations around April 1, 2001. Dzurik sent royalty checks in May of 2001 to the O'Neals. The check to Webb was for $5,106; the check to O'Neal was for $3,926. These checks, which apparently were for royalties owed for the period of May 1999 through August 2000, were for different amounts because O'Neal had cashed the earlier royalty check from Pace. Later that month, the O'Neals sent separate letters to Dzurik in which they wrote that the checks were being returned because they believed that the lease had expired and they were entitled to 100% royalties from the OW-2's production on or after May 1, 1999, that was attributable to their ownership of the lands included in the unit. The O'Neals later returned royalty checks from Dzurik that they received in July of 2001.
On April 17, 2001, Joe Wojtkiewicz, who acted as an oil and gas consultant to the O'Neals and who was also employed by C.H.C. Gerard, wrote a letter to James Broussard, the District Manager for the Louisiana Office of Conservation ("Conservation"), in which he urged Conservation to seal the OW-2, which Conservation declined to do. Broussard explained that sealing a well means shutting-in a well and placing a Conservation seal on it, and that sealing a well was the most severe enforcement action and would not be done just because a well was not producing. Broussard had also received telephone calls from O'Neal and Wojtkiewicz about sealing the well.
On July 23, 2001, the O'Neals filed suit against JLH Enterprises, Inc., Ida Oil Corporation, and Dzurik Interests, Inc. They sought:
 a declaratory judgment stating that the mineral lease had expired on or before October 21, 1994, as to all lands covered by the lease except the land included in the unit for OW-2;
 a declaratory judgment stating that the lease had expired as to the land included in the unit for OW-2 due to a failure to produce or failure to produce in paying quantities;
 the recovery of royalties from OW-2 during 1999 and thereafter; and
 additional damages of double the royalties due, an accounting, and attorney fees.
Dzurik filed a reconventional demand asserting that its right to peaceable enjoyment of its leasehold interest had been disturbed by the March 16, 2000, lease; March 2000 affidavit; and letters to Conservation. Named as defendants to the reconventional demand were the O'Neals, Joe Wojtkiewicz, and C.H.C. Gerard.
Following a bench trial in July 2002, the trial court rendered judgment ordering that the 1985 lease remained in full force and effect in favor of the lessee, and that any past-due royalties were to be paid in full with interest from the original due date. Costs were assessed to defendants.

DISCUSSION
Production
The O'Neals first argue on appeal that the lease expired by its own terms prior to March 1, 2001 due to the failure of the OW-2 to produce for a period of more than 90 days. They specifically contend that there was no natural gas production from the OW-2 from August, 2000 through February, 2001.
Our examination of appellants' arguments begins with the language of the O'Neal-JLH lease, which states, in part:

*1025 2. Subject to the other provisions herein contained, this lease shall be for a period [reference to Exhibit A of lease] from this date (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

* * *
6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a dry hole or holes on the land described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur, or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling or reworking thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling or reworking with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith....
La. R.S. 31:133 provides that a mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition.
The language from paragraph six of the lease regarding reworking operations does not aid defendants in this instance. The last workover during the August 2000 to February 2001 period ended on October 23, 2000. According to defendants' calculations, 90 days from that date is January 21, 2001.
In order to address the O'Neals' claims, it is necessary to summarize the OW-2 production reports from the relevant months that were filed with Conservation by the working interest operators:

Month-Year Crude Oil/Condensate Natural Gas/Casinghead
of Production Production (barrels) Gas Production (MCF)
07-99 0 450
07-99 0 450
08-99 0 2042
09-99 0 5074
10-99 0 5386
11-99 0 2624
12-99 0 1080
01-00 0 0
02-00 0 403
03-00 0 20
04-00 60 95
05-00 60 102
06-00 20 0
07-00 0 259
08-00 20 0
09-00 25 0
10-00 60 0

*1026
11-00 0 0
12-00 30 0
01-01 18 0
02-01 22 0
03-01 38 (Listed as -59 on 0 Conservation summary)
04-01 32 0
05-01 5 (Listed as -5 on 0
 summary)
06-01 27 (Listed as 5 on 0
 summary)
07-01 36 0
08-01 81 (Listed as -20 on 0
 summary)
09-01 79 0
10-01 67 0
11-01 56 0
12-01 74 0
01-02 87 0
02-02 94 0
03-02 96 0
04-02 45 0
05-02 51 0
06-02 108 0

It is obvious from the production records that although there was no gas production reported during the months of August 2000 through February 2001, there was condensate production during this period.[2] It was explained at trial that condensate is a light oil that is extracted on the surface from gas produced at the well. Although it is apparently possible to produce gas without condensate, gas production is required in order for condensate to be extracted. Thus, the O'Neals are skeptical that condensate was even produced as reported because there was no reported gas production.
Harrison testified that there was condensate production without reported gas production during the period of August 2000 to February 2001 because Pace lacked a compressor to sell the gas due to plaintiffs' actions, which will be explained later in this opinion; therefore, the gas that was being produced was utilized to
operate the pump, with the remainder flared or vented. Although Harrison never notified Conservation that he was flaring gas, he believed that Conservation knew about it from its well-site inspections.
Kevin Dzurik testified that when he inspected the lease before acquiring it, he saw and heard the OW-2 venting gas. He added that the engine for the pumping unit was powered by natural gas, the heater-treater ran on gas, the vessel had gas-operated dumps, and gas pressure was used to send liquids to the tanks; in sum, gas was used to operate the surface production facility, and the remaining gas was vented. Dzurik also explained that if no gas was sold, the production reports would show zero disposition of gas to a buyer.
Dzurik initially believed that it was not a violation of the rules and regulations of Conservation to vent gas without a permit. *1027 He claimed that he told Broussard about the venting prior to the acquisition and that Broussard did not have a problem with it.
The habendum clause of the lease provided that if production ceased after the primary term of the lease, the lease would remain in effect as long as the lessee was producing oil, gas, or other mineral from the land. Even though no gas production was reported during the months at issue, condensate production was reported. Accordingly, oil, or at the very least "other mineral," was being produced. Plaintiffs' argument on this issue is without merit.
Paying Quantities
The O'Neals next argue that even if the OW-2 did not fail to produce for a period of more than 90 days, it still expired prior to March 1, 2001, as it failed to produce in paying quantities from February 2000 through February 2001. La. R.S. 31:124 requires production in paying quantities when a mineral lease is maintained by production of oil or gas. That article provides that production is in paying quantities when:
... production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss.
Implicit in the term "paying quantities" is that the lessee is required to show a profit; production income must exceed operating expenses. Menoah Petroleum, Inc. v. McKinney, 545 So.2d 1216 (La.App. 2d Cir.1989).
The O'Neals contend that lease operating expenses exceeded unit net revenues for each month during the period of February 2000 through February 2001. In addition, they argue that when comparing the total lease operating expenses of $41,442 during this period to the total unit revenue of $8,460 during the same period, it is evident that the OW-2 was operated at a substantial loss. In making this argument, the O'Neals relied upon operating statements prepared by Pace for Ida.
An examination of the operating statements shows that when plaintiffs calculated the operating expenses in order to establish their claim, plaintiffs deducted only some of the expenses that defendants urge were incurred in the four workover operations done by Pace during the 13 months at issue. The workovers were from February 2, 2000, through February 18, 2000; March 9, 2000, through May 15, 2000; July 7, 2000, through July 10, 2000; and October 11, 2000, through October 23, 2000. Filed into evidence by defendants were invoices or work tickets from the companies with whom Pace contracted for the workover services. The workover expenses were listed on Pace's operating statements under the general category of "operating expenses," although no significance should be given to this categorization by Pace as the operating statements were prepared for a client, not in anticipation of litigation over paying quantities.
Workover expenses, considered to be extraordinary expenses, are generally distinguished from operating expenses and should not be included as an operating expense when determining if there was production in paying quantities. Lege v. Lea Exploration Company, Inc., 93-065 (La.App. 3rd Cir.2/2/94), 631 So.2d 716, writ denied, 94-0450 (La.4/4/94), 635 So.2d 1112.
In Jardell v. Hillin Oil Co., 485 So.2d 919 (La. 1986), the supreme court discussed what constitutes a reworking operation:
... No doubt an exact definition of reworking operations is difficult to formulate. The problems of producing oil and *1028 gas thousands of feet below the surface are many and varied, as are the procedures for rectifying production that is sluggish or has ceased. See Williams and Meyers, Oil and Gas LawManual of Oil and Gas Terms, 758-59 (1984) (citing Lone Star Producing Co. v. Walker, 257 So.2d 496, 500 (Miss.1971).) However, the prior jurisprudence of this state has provided some guidance for distinguishing reworking operations from routine maintenance. For reworking to occur, it is necessary first that production has ceased or slowed down or has never been achieved. Reworking need not involve additional drilling. It is also clear that reworking operations encompass essential preparatory steps. Furthermore production need not be resumed during the delay. There is also the suggestion that the operations conducted by the lessee must be a good faith effort to resume production as soon as possible.
The Manual of Oil and Gas Terms, supra, mentions additional factors cited by courts in other jurisdictions as determinative of a reworking operation. The Alabama Supreme Court in Sheffield v. Exxon Corp., 424 So.2d 1297, 1303 (Ala. 1982) declared that an activity should be physically associated with the well site and intimately connected with the resolution of the difficulty that caused the well to cease production in order for it to constitute reworking. However, the presence of a workover rig at the well site was not found to be a necessary incident to a reworking operation in Lone Star Producing Co. v. Walker, 257 So.2d at 500. And, whatever the activity, it must be done "as an ordinarily competent operator would do in the same or similar circumstances," according to a Texas court. Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311, 314 (1953).
Footnote omitted. Id., 485 So.2d at 924-5.
When categorizing an expense as an operating expense to determine if production was in paying quantities, ordinary and recurring expenses are generally distinguished from expenses that are extraordinary and largely non-recurring. See, Lege v. Lea Exploration Company, Inc., supra.
We note from the outset that the only recurring monthly expenses during this period were a $650 administrative fee paid to Pace and a $383.33 pumper charge fee. In addition, a chart allocation fee that ranged between $2.20 and $38.70 was charged in 10 of the 13 months. There was a property tax charge of $890.65 in December, which would also be a recurring expense, albeit on an annual basis.
Summarized in the table below are the unit net revenue (after the severance tax is deducted) and total expense figures reflected in Pace's operating statements; what plaintiffs allege were the operating expenses and the reworking expenses; and what defendants allege were the reworking expenses as supported by invoices. The unit net revenue for each month is from the sale of gas that had been produced two months earlier. It should be noted that the operating statements do not reflect the sale of condensate.

 Operating Workover Workover
 Expenses Expenses expenses
 Unit Net Total Recurring alleged by alleged by supported
Date Revenue Expenses Expenses O'Neals O'Neals by invoices
02-00 $ 2313.36 $ 7240.01 $ 1035.53 $ 4132.96 $ 3107.05 $ 5154.48
03-00 2615.81 5051.64 1038.83 3654.64 1397.00 4012.81

*1029
04-00 885.17 3586.33 1033 1897.33 1689.00 1853
05-00 50.24 17535.47 1036.63 4986.68 2548.79 16498.84
06-00 241.49 7771.63 1036.63 7771.63 0 5154
07-00 270.50 7059.38 1039.93 4081.38 2978.00 4819.45[3]
08-00 480.79 3319.09 1074.23 3319.09 0 0
09-00 984.98 1036.58 1036.58 1036.58 0 0
10-00 648.21 5708.33 1033.33 4819.58 888.75 3975.00
11-00 0 1742.70 1036.58 1742.70 0 0
12-00 0 1927.14 1927.14 1927.14 0 0
01-01 0 1036.58 1036.58 1036.58 0 0
02-01 0 1036.58 1036.58 1036.58 0 0
_________________________________________________________________________________________________
Total 8,460.65 64,051.46 14,401.57 41,442.87 22,608.59 41,467.58

It is apparent that even if defendants receive credit for every workover expense that they claim, the operating expenses of $22,583.88 ($64,051.46 minus $41,467.58) still exceed the net revenues of $8,460.65. However, for two reasons, this initial calculation is not dispositive of the O'Neals' allegation.
First, we note that the period of production to be examined is not limited to 13 months. Compare Edmundson Brothers Partnership v. Montex Drilling Company, 98-1564 (La.App. 3rd Cir.5/5/99), 731 So.2d 1049, where the court examined production over an 18-month period. The gap between revenues and operating expenses is eliminated if we consider some of the earlier operating statements that were entered into evidence by plaintiffs. The nature of the recurring expenses remain the same for these additional months.

 Workover expenses
 expenses
 Unit Net Total Recurring supported by
Date Revenue Expenses Expenses invoices
05-99 $ 0 $ 4,167.14 $ 1,038.83 $ 1,673
06-99 0 11,679.64 1,038.83 7,875.50
07-99 13,949.15 1,033.33 1,033.33 0
08-99 10,894.08 1,430.28 1,080.28 0
09-99 981.90 5,277.77 1,038.83 0
10-99 4,569.99 1,038.83 1,038.83 0
11-99 11,360.69 1,471.63 1,122.63 0
12-99 12,350.10 16,005.80[4] 1,953.67 12,548.13
01-00 6,932.61 1,156.13 1,033.33 0
___________________________________________________________________________
Total 61,038.52 43,260.55 10,378.56 22,096.63

Two workovers were performed during these earlier months. The first occurred from May 14 to June 22, 1999. A new zone was not perforated during this workover. The second workover occurred from December 10 through December 30, 1999. A new zone below the existing zone was perforated during this workover.
During the period of May of 1999 through January of 2000, the net revenues of $61,038.52 exceeded the actual operating expenses of $21,163.92 ($43,260.55 minus *1030 $22,096.63) by $39,874.60.[5] In addition, taking these additional months into consideration, for the period of May 1999 through February 2001, net revenues of $69,499.17 exceeded the operating expenses of $62,606.79. We reach the latter figure by taking $41,442.87, which is what plaintiffs state are the operating expenses for February of 2000 through February of 2001, and adding $21,163.92, which is reached by deducting the workover expenses supported by invoices from the "operating expenses" reported on the operating statements for May of 1999 through January of 2000.
It is also important not to examine the unit net revenue in isolation. Defendants aver that actions taken by O'Neal and his representatives impaired their ability to sell the gas that was produced and which would have yielded income from the well. A mineral lessor is obligated to refrain from disturbing the lessee's possession and to perform the contract in good faith. La. R.S. 31:119. Interference with the mineral lessee's rights would not excuse the performance of the lessee, but would only delay such performance. In re WRT Energy Corp., 202 B.R. 579 (Bankr.W.D.La. 1996).
On May 15, 2000, the O'Neals' attorney, David Klotz, wrote to Genesis Crude Oil, which was transporting the condensate from the well, that the lease had expired and that Genesis was no longer to go onto the property. On that same date, Klotz wrote a letter to Precision Pipeline, the gas gatherer, stating that the lease had expired and that Precision was to have no contractual dealings with Pace regarding the OW-2. O'Neal's March 16, 2000, affidavit was attached to each letter. On May 22, 2000, Precision wrote to Pace that due to Klotz's letter concerning the cancellation of the lease, it would shut-in Pace's interconnect into Precision's gathering system.
After receiving the letter from Precision, Pace rented a gas compressor from Lion Services, repiped the system, and started selling gas to Sonat Southern Natural Gas. On July 25, 2000, Klotz wrote to Lion Services to inform them that the lease had been cancelled and to demand that Lion Services remove their compressor. A copy of O'Neal's affidavit was attached to the letter. The production records show no gas production for the month (June) after the letters to Genesis and Precision, gas production for July, then no gas production for the month (August) after the letter to Lion Services.
The effects of the O'Neals' interference continued as the reports through June of 2002 show zero natural gas production. Dzurik testified that other companies are not comfortable about leasing him equipment until the lease issue is settled. Dzurik has paid Sonat not to remove the tap in the event that Dzurik will be able to sell the gas.
Revenues from gas production presumably would have been greater had O'Neal and his associates not interfered with the lessor's ability to produce the well. Based upon our review of this record, we cannot conclude that the trial court was clearly wrong in finding that the 1985 lease remained in effect.
Royalties
Finally, we consider the O'Neals' contention that they are entitled to damages of double the amount of royalties and attorney fees as a result of Pace's failure to timely pay royalties, as well as Sundance's late payment of royalties for the months of January through April 1999.
When a mineral lessor seeks relief for the failure of the lessee to make timely or *1031 proper payment of royalties, he must give his lessee written notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease. La. R.S. 31:137. The lessee shall then have 30 days after receiving the required notice to pay the royalties due or to respond by stating in writing a reasonable cause for nonpayment. La. R.S. 31:138. If the lessee pays the royalties due, and the original failure to pay was either fraudulent or willful and without reasonable grounds, the court may award as damages double the amount of royalties due. La. R.S. 31:139. If the lessee fails to pay the royalties due, or fails to inform the lessor of a reasonable cause for failing to pay in response to the required notice, then the court may award as damages double the amount of royalties due. La. R.S. 31:140. The use of the word "may" indicates that an award of damages of double the royalties is within the court's great discretion. See, Fuller v. Franks Petroleum, Inc., 501 So.2d 1024 (La.App. 2d Cir.1987); Wegman v. Central Transmission, Inc., 499 So.2d 436 (La. App. 2d Cir.1986), writ denied, 503 So.2d 478 (La.1987).
Ben O'Neal sent an undated letter to William Roseberry, President of Sundance, in which he wrote, "After repeated telephone demands made during the months of December 1998, January 1999 and February 1999, for my royalties from the above-referenced well you have sent me a check for the production month of November 1998 which I received during March 1999." He continued that due to Sundance's failure to respond to the demand for payment within 30 days, he would seek a remedy under La. R.S. 31:140. This letter was apparently sent to Roseberry in March of 1999.
This letter does not constitute the written demand required by La. R.S. 31:137. We note the Comment to La. R.S. 31:137, which states, in part:
Article 137 contemplates that at any time there has been a nonpayment of royalties, the lessor must notify the lessee. It is not intended that this notice be a demand for performance as in the case of the traditional default under the Civil Code. The lessor may not desire performance. The device of notice, then, is merely to inform the lessee that he has not paid royalties deemed by the lessor to be due.
The letter was neither a desire for performance nor used to inform Sundance that it has not paid royalties. In fact, the letter indicates that the royalty payment for November 1998 had already been received; O'Neal was merely informing Sundance that it was received more than 30 days aftertelephoned demands for payment.
Moreover, La. R.S. 31:138 sets forth the response required of the lessee upon receiving the written demand:
The lessee shall have thirty days after receipt of the required notice within which to pay the royalties due or to respond by stating in writing a reasonable cause for nonpayment. The payment or nonpayment of the royalties or stating or failing to state a reasonable cause for nonpayment within this period has the following effect on the remedies of dissolution and damages.
Obviously, Sundance could not respond as such because it had already responded to telephoned demands for payment. Accordingly, the penalty provisions of La. R.S. 31:139 were not triggered, and the remedy of double the amount of royalties due and attorney fees was not available. In any event, even if the letter was in compliance with La. R.S. 31:137, we cannot conclude that the trial court abused its discretion in denying plaintiffs' claims.
Pace assumed operations effective May 1, 1999. Dzurik Interests took over operations *1032 in April 2001. The record reflects that in July 1999, Pace paid $1,089 in royalties to each of the O'Neals for May 1999's production from the OW-2. Apparently, this was the only royalty payment made by Pace to the O'Neals. Ben O'Neal cashed his check, but his sister did not cash her check. In May of 2001, Dzurik sent royalty checks for $5,106 to Webb and for $3,926 to Ben O'Neal. The checks were for royalties owed by Pace for the period of May 1999 through August 2000.
The O'Neals argue that because the March 1999 letter to Sundance gave notice that the lease was in default for the failure to pay past-due royalties within 30 days, it was unnecessary for them to make subsequent written demands upon Pace for payment of past-due royalties. We disagree. As noted above, Sundance never received the required written demand. Thus, in order for Pace to be subject to the penalty provisions, it would have had to have received written demand, which is not the case, plaintiffs are attempting to rely on the insufficient letter to Sundance. Accordingly, the trial court did not err in denying the O'Neals' claims for attorney fees and double the amount of past-due royalties based upon Pace's failure to pay royalties.

DECREE
At appellants' costs, the judgment is AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, PEATROSS, DREW, and MOORE, JJ.
Rehearing denied.
BROWN, J., would grant rehearing.
NOTES
[1] The District Manager for the Office of Conservation testified that O'Neal No. 1 was under a compliance order to plug after the trial. He added that Sundance plugged O'Neal No. 3 in August of 1997.
[2] Ronald Loftin, a pumper, testified that the tank on the OW-2 has the capacity to hold 210 barrels of condensate.
[3] This figure does not include the Energy Wireline invoice for $2395 for a perforation that was not listed on the operating statement.
[4] Not included is the $883.16 charge for 1998 taxes that were not paid.
[5] Measuring operating expenses by deducting workover expenses supported by invoices from the total expenses listed on the operating statements.